Hillsborough-southern judicial district
No. 2004-717

PENNICHUCK CORPORATION & a.

v.

CITY OF NASHUA

Argued: September 15, 2005
Opinion Issued: November 16, 2005

*McLane, Graf, Raulerson & Middleton, P.A.*, of Manchester (*Thomas J. Donovan* and *Sarah B. Knowlton* on the brief, and *Mr. Donovan* orally), for the plaintiffs.

*Office of Corporation Counsel*, of Nashua (*David R. Connell* on the brief and orally), and *Upton & Hatfield, LLP*, of North Conway (*Robert Upton, II* on the brief), for the defendant.

*Kelly A. Ayotte*, attorney general (*Edith L. Pacillo*, attorney, on the brief), for the State, as *amicus curiae*.

DUGGAN, J. The plaintiffs, Pennichuck Corporation, Pennichuck Water Works, Inc., Pennichuck East Utility, Inc. and Pittsfield Aqueduct Company, Inc. (Pennichuck), appeal an order by the Superior Court (*Lynn*, C.J.) granting summary judgment to the defendant, City of Nashua (City), and ruling that the provisions of RSA chapter 38 (2000 &

Supp. 2005) do not constitute a *per se* inverse condemnation in violation of the New Hampshire Constitution. The court also ruled that the City filed its petition with the New Hampshire Public Utilities Commission (PUC) within a reasonable time and that it was not barred by laches. We affirm.

The following summary of RSA chapter 38 procedures, taken primarily from the well-reasoned superior court order, provides necessary context for the facts of this case.

RSA chapter 38 empowers municipalities to take by eminent domain privately owned electric, gas and water utilities in order to maintain and operate them as publicly owned facilities. RSA 38:2, I, II (2000). In order to initiate the process of acquiring a utility, there must first be an affirmative vote by two-thirds of the members of the municipal governing body. This vote must then be confirmed by a majority vote of the municipality's qualified voters at a regular election or special meeting called for this purpose. RSA 38:3 (2000). A favorable confirming vote creates a rebuttable presumption that the acquisition is in the public interest. *Id.* Within thirty days of the confirming vote, the municipality must notify the utility and inquire if it is willing to sell the identified plant and property located within the municipality, as well as "that portion, if any, lying without the municipality which the public interest may require, pursuant to RSA 38:11 as determined by the [PUC]." RSA 38:6 (2000). The utility is given sixty days to respond. RSA 38:7 (2000).

The parties may then negotiate and reach a tentative agreement on the assets to be sold and the sale price, subject to ratification by a vote of the municipality to issue the necessary revenue bonds for the acquisition price. RSA 38:8 (2000), :13 (2000). If no agreement is reached, either party may petition the PUC to determine whether it is in the public interest for the municipality to purchase some or all of the utility's property located inside or outside of the municipality. RSA 38:9, I (2000). The PUC also determines the amount of "just compensation" or damages that the municipality must pay for the assets in question. RSA 38:9, I, III (2000), :10 (2000). The statute contains a "second-look provision," which provides that after the PUC sets the acquisition price, the municipality must decide whether or not to purchase the assets for that price by a vote to issue revenue bonds pursuant to RSA 33-B:2 (Supp. 2005). RSA 38:13. If the vote is in the affirmative, the municipality may proceed to acquire the assets at the price set by the PUC. *Id.* If the vote is in the negative, no further proceedings under RSA chapter 38 can be commenced for a period of two years. *Id.*

The trial court found the following facts. Pennichuck and its subsidiaries operate public utilities providing water supply services to approximately 35,000 customers in New Hampshire. Most of these customers are in

Nashua and surrounding communities; however, Pennichuck's services extend to communities as far away as Pittsfield. Pennichuck's headquarters are in Nashua.

On April 29, 2002, Pennichuck entered into an "Agreement and Plan of Merger" with Philadelphia Suburban Corporation (PSC) whereby Pennichuck was to become a direct and wholly owned subsidiary of PSC. Pennichuck filed a petition with the PUC seeking approval of the merger on June 14, 2002. The City moved to intervene in the PUC proceedings and objected to the merger.

On November 26, 2002, Nashua's board of aldermen voted fourteen to one to adopt a resolution to acquire the plant and property of Pennichuck's water works system. By referendum held on January 14, 2003, the Nashua electorate voted to pass a resolution authorizing the City to acquire all or a portion of the water works system then serving the inhabitants of Nashua.

Following the referendum, PSC withdrew from merger talks with Pennichuck. On February 5, 2003, the City sent written notification to each of Pennichuck's utilities, describing the assets it sought to acquire and inquiring whether Pennichuck was willing to sell these assets to the City. On March 25, 2003, Pennichuck responded that it did not intend to sell any of its assets to the City. The next day, the City informed Pennichuck that it intended to petition the PUC to condemn the Pennichuck assets identified in its inquiry letters.

Pennichuck then entered into negotiations with the City concerning terms of a possible sale of some or all of Pennichuck's assets. On November 30, 2003, the City made a formal offer to purchase Pennichuck's assets for $121 million. Pennichuck rejected this offer on December 15, 2003, and terminated negotiations with the City on January 27, 2004.

Pennichuck filed suit in the superior court on February 4, 2004, seeking a declaratory judgment to terminate or limit the City's condemnation efforts. On March 24, 2004, the City filed a condemnation petition with the PUC, asking it to find the condemnation of Pennichuck's assets in the public interest and to determine damages the City must pay Pennichuck as a result of the taking. The City then moved to dismiss Pennichuck's claim for declaratory judgment in superior court. Pennichuck objected and filed a motion for summary judgment, which was supported by its verified petition. The City objected and filed a cross-motion for summary judgment, which was supported by the affidavits of Nashua's mayor, Bernard Streeter, and alderman at large, Brian McCarthy.

On August 31, 2004, the trial court granted summary judgment in favor of the City. On appeal, Pennichuck argues that the superior court erred by: (1) ruling that the procedures of RSA chapter 38 do not create a *per se* inverse condemnation in violation of the New Hampshire Constitution; (2)

ruling that the City filed its petition within a reasonable time; and (3) ruling that the petition was not barred by laches.

*I. Inverse Condemnation*

Pennichuck argues that RSA 38:1-:13 are facially unconstitutional and result in inverse condemnation because they permit the City or any other condemnor to initiate the taking process, but then walk away years later with no liability for the costs imposed on the condemnee. Pennichuck argues:

> The sequence of events, allowable under RSA [chapter] 38, has the devastating effect of keeping a utility frozen and unable to operate its business in a normal fashion [and] makes it a practical impossibility that other businesses would consider acquiring or being acquired by the condemned company while the cloud of threatened condemnation persists. It is precisely this effect of depriving an individual or business from the economic use of its property that New Hampshire inverse condemnation law is designed to protect against.

We review the trial court's determination of the constitutionality of the statute *de novo. Webster v. Town of Candia,* 146 N.H. 430, 434 (2001).

"Inverse condemnation occurs when a governmental body takes property in fact but does not formally exercise the power of eminent domain." *Sundell v. Town of New London,* 119 N.H. 839, 845 (1979) (citation omitted). Inverse condemnation may be effected through either physical act or regulation. *Appeal of Public Service Co. of New Hampshire,* 122 N.H. 1062, 1071 (1982). We look to the individual circumstances of each case to determine whether there is an unconstitutional taking. *Burrows v. City of Keene,* 121 N.H. 590, 598 (1981). We have found no greater right of the government to "take" merely because a regulated utility is involved. *Appeal of Public Service Co. of New Hampshire,* 122 N.H. at 1071.

To determine whether an inverse condemnation has occurred, we consider whether "arbitrary or unreasonable restrictions which substantially deprive the owner of the economically viable use of his [property] in order to benefit the public in some way constitute a taking within the meaning of our New Hampshire Constitution." *Burrows,* 121 N.H. at 598 (quotations omitted). Limitations on use create a taking if they are so restrictive as to be economically impracticable, resulting in a substantial reduction in the value of the property and preventing the

private owner from enjoying worthwhile rights or benefits in the property. *Id.* at 601.

■ Pennichuck asks us to find that RSA chapter 38 effects inverse condemnation because it substantially interferes with Pennichuck's investment-backed expectations for operating a long-lasting and successful utility. Pennichuck relies upon *Appeal of Public Service Co. of New Hampshire,* in which we stated that the extent to which a regulation has interfered with "distinct investment-backed expectations" is a particularly significant consideration in determining whether a taking has occurred. *Appeal of Public Service Co. of New Hampshire,* 122 N.H. at 1071. In *Appeal of Public Service Co. of New Hampshire,* the utility was unable to operate a plant as a result of a PUC order denying it the means to build the plant, the construction of which had been approved by the legislature. *Id.* at 1070-72. Unlike the utility in *Appeal of Public Service Co. of New Hampshire,* Pennichuck remains able to operate while subject to RSA chapter 38 condemnation proceedings. While Pennichuck ultimately may or may not be condemned pursuant to RSA chapter 38, Pennichuck has not been deprived of the economically viable use of its property, nor will such a deprivation occur unless and until all necessary steps to the condemnation process have been completed.

■ Pennichuck, however, argues that an inverse condemnation has already occurred, alleging that it has suffered a loss of approximately eighty million dollars in shareholder investments while subject to RSA chapter 38. The United States Supreme Court has refused to find an inverse condemnation when a decrease or fluctuation in value results from municipal condemnation proceedings. *Agins v. Tiburon,* 447 U.S. 255, 263 n. 9 (1980), *overruled on other grounds by Lingle v. Chevron,* 125 S. Ct. 1074 (2005). Similarly, any alleged fluctuation in the value of Pennichuck's assets which took place while Pennichuck was subject to RSA chapter 38 condemnation proceedings did not give rise to a taking.

We agree with the trial court's finding that:

> While Pennichuck's business operations may have been affected by uncertainty and the value of its stock may have fluctuated over the period since the City first announced its intent to institute condemnation proceedings, and while Pennichuck may have incurred legal and other fees in fighting the City's attempted taking, these are simply the inherent risks of ownership in a system, such as ours, where all property is held subject to the sovereign's exercise of the power of eminent domain.

*See Cayon v. City of Chicopee*, 277 N.E.2d 116, 119 (Mass. 1971) ("The fact that at some future time land might be taken under eminent domain, even [where] the threatened taking is imminent, is but one of the conditions on which an owner holds property."). We thus conclude that no taking has occurred.

## II. Reasonable Time

Pennichuck argues that even if there was not an inverse condemnation, the trial court erred in granting summary judgment to the City because the City did not file its condemnation petition within a reasonable time.

In reviewing whether the trial court properly granted summary judgment, we consider affidavits and other evidence as well as all inferences properly drawn from them in the light most favorable to the non-moving party. *Stateline Steel Erectors v. Shields*, 150 N.H. 332, 334 (2003). If our review of that evidence discloses no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law, we will affirm the grant of summary judgment. *N.E. Tel. & Tel. Co. v. City of Franklin*, 141 N.H. 449, 452 (1996). We review the trial court's application of the law to the facts *de novo. Stateline Steel Erectors*, 150 N.H. at 334.

In support of its argument that the City failed to submit its condemnation petition within a reasonable time, Pennichuck contends, first, that the trial court failed to consider time limitations in other condemnation statutes, and, second, that the City's actions were in fact unreasonable.

Pennichuck argues that "although there is no explicit statute of limitations in RSA [chapter] 38, it does contain some time-limited triggers that provide a basis for determining what constitutes a 'reasonable time' to file a condemnation petition."

"As in all cases underlining statutory construction, the starting point is the language of the statute. We construe each statute as a whole, and if the statute's language is clear and unambiguous, we do not look beyond the statute to discern legislative intent." *Hughes v. N.H. Div. of Aeronautics*, 152 N.H. 30, 38 (2005). "The legislature is presumed to know the meaning of words, and to have used the words of a statute advisedly." *Caswell v. BCI Geonetics, Inc.*, 121 N.H. 1048, 1050 (1981) (quotation omitted). "The legislative intent is to be found not in what the legislature might have said, but rather in the meaning of what it did say." *Id.*

Here, we presume that the legislature intended not to include a time limitation for filing a condemnation petition in RSA chapter 38. We have, however, held that where the legislature has provided a time limitation for what constitutes a reasonable time in a substantively analogous situation, such a time limitation "will prove a fair guideline as to what constitutes a

reasonable time." *Wilson v. Personnel Comm'n*, 117 N.H. 783, 784 (1977). In *Wilson*, we held that a thirty-day time limitation applied to a proceeding for which there was no statutory time period, because the thirty-day period applied to proceedings that were substantively analogous to the one challenged. *Wilson*, 117 N.H. at 785.

Pennichuck argues that the trial court should have considered the ninety-day limitation contained in other provisions of RSA chapter 38, the New Hampshire Eminent Domain Act and the Model Eminent Domain Act, and found them to reflect the legislature's view that ninety days is a reasonable period of time in which a condemnor must act when invoking its eminent domain power. *See, e.g.*, RSA 38:3, :7; RSA 498-A:4, III(c) (1971); 6 J. SACKMAN, NICHOLS ON EMINENT DOMAIN, § 24.07[2], at 24-90 (3d ed. 1995).

Here, unlike in *Wilson*, the time limitations governing proceedings in other condemnation statutes are not substantively analogous to filing a condemnation petition under RSA chapter 38. We do not agree with Pennichuck's contention that the ninety-day limitation in the Eminent Domain Act reflects the legislature's view that ninety days is a reasonable time in which to file a condemnation petition. RSA 498-A:4, III(c) (Supp. 2005). The Eminent Domain Act expressly exempts from its jurisdiction condemnation proceedings by municipalities subject to RSA chapter 38. RSA 498-A:3 (1997). Thus, applying the time limitation contained in the Eminent Domain Act would directly controvert the legislative directive that the Eminent Domain Act should not apply to municipal condemnation actions.

Nor do we agree with Pennichuck that the time limitations in the Model Eminent Domain Act should apply to the filing of the City's condemnation petition. Under the Model Eminent Domain Act, a condemnor must file a condemnation petition within six months of the date the condemnation is authorized, and within three months of the failure of negotiations for the purchase of property. 6 SACKMAN, *supra*. However, the Model Eminent Domain Act is not the law in this State and the language of the Model Eminent Domain Act itself reads, "The time limits prescribed are not true statutes of limitation, since the condemnor is, and in principle should be, free to initiate a condemnation action at any time. Failure to commence the action within the time period thus does not bar the action." *Id.*

Finally, we disagree with Pennichuck's argument that the ninety-day limitation which applies to other procedures governed by RSA chapter 38 should apply to the filing of the City's condemnation petition. Pennichuck argues that:

The most critical trigger in the statute is the public vote on the taking. RSA 38:3. Once this vote is taken, the municipality has only 30 days to notify the utility that it intends to take the utility's assets by eminent domain, and in turn, the utility has only 60 days to respond to the request. RSA 38:6. Thus, 90 days from the public vote, either there must be an agreement in concept to sell, or the municipality must invoke its legal sword to attempt to force the taking.

█ Here, the City complied with the provisions of RSA 38:3 and :6 by notifying Pennichuck of its intention to take Pennichuck's assets within thirty days of the January 14, 2003 referendum. Under RSA 38:3 and :6, a utility must only respond to the municipality's notice and, at that stage, need not have considered price terms, appraisal value or the effect of possible negotiations. In the fourteen months between the referendum and the City's filing its condemnation petition, the parties engaged in complex negotiations, during which the City determined an offer price and waited for Pennichuck's response before resorting to filing a condemnation petition. The ninety-day limitation in RSA chapter 38 contemplates a process less complex and not substantively analogous to the City's filing its condemnation petition following failed negotiations. We thus conclude that the trial court did not err when it did not apply a time limitation contained in another statutory provision to the timing of the City's filing of its condemnation petition.

Pennichuck next argues that the trial court erred in finding that the City's actions were reasonable and argues that, "had the court considered competent evidence presented by Pennichuck, it should have determined that Nashua's actions were in fact unreasonable." The City argues that, in the absence of a time limitation for filing a condemnation petition under RSA chapter 38, filing within twelve months of Pennichuck's initial refusal to sell and within sixty days of when Pennichuck terminated negotiations was reasonable. It argues that Pennichuck "simply did not offer the requisite 'specific facts showing that there is a genuine issue for trial.'"

█ Where a condemnation statute does not contain an explicit time limitation, condemnation proceedings must be instituted within a reasonable time. 6 SACKMAN, *supra* § 24.07[1], at 24-87 to -89. While we have not before had the occasion to apply this principle to condemnation proceedings under RSA chapter 38, we applied a similar principle in *Hughes*. There, we held that in the absence of a statutory time limitation in which the State must exercise its right of first refusal to purchase property, the State must perform within a reasonable time. *Hughes*, 152 N.H. at 39; *see also Opinion of the Justices*, 114 N.H. 165, 169 (1974).

This equitable principle is derived from contract principles which require that performance must be within a reasonable time where no time for performance is specified by statute or agreement. *See, e.g., Belleau v. Hopewell*, 120 N.H. 46, 51 (1980) (where listing agreement between real estate brokers and sellers did not specify a time for payment of broker's fees, performance was due in a reasonable time); *Leavitt v. Fowler*, 118 N.H. 541, 543 (1978) (when time is not of the essence in a purchase-and-sale agreement, a party will have a reasonable period of time after the specified closing date in which to perform his obligations under the contract).

Other jurisdictions have required initiation of condemnation proceedings within a reasonable time where condemnation statutes lack an explicit time limitation. *See, e.g., Public Service Co. of Indiana, Inc. v. Decatur County Rural Elec. Membership Corp.*, 363 N.E. 2d 995 (Ind. Ct. App. 1977) (eleven years between conference of public service company authority to begin condemnation proceedings and exercise of condemnation rights was not unreasonable); *In the Matter of Condemnation by Urban Redevelopment Authority of Pittsburgh*, 544 A.2d 87 (Pa. Commw. Ct. 1988) (ten years between urban redevelopment authority's receipt of blight certification and declaration of taking was not unreasonable); *Lewis County v. McCutcheon*, 101 P. 1083 (1909) (almost twelve years between date legislation passed granting municipality authority to condemn and commencement of condemnation proceedings was unreasonable).

In determining whether the City's delay in this case was reasonable, Pennichuck argues that the trial court should have found a genuine issue of material fact. The trial court found that:

> [The City] has produced proof by way of the affidavits of Mayor Streeter and Alderman McCarthy detailing the efforts the City undertook between March 2003 and January 2004 to reach a negotiated acquisition of Pennichuck's assets. Pennichuck has offered no counter affidavits or other competent evidence to refute the sworn averments of Messrs. Streeter and McCarthy.

Pennichuck's verified petition states:

> Following [the City's] March 26[, 2003] letter, the parties held occasional meetings to discuss [the City's] interest in purchasing Pennichuck or its assets. These meetings were always held in response to requests by [the City], and concerned only issues of a general nature. On information and belief, the superficial nature of these meetings was a consequence of [the City] never having retained a financial, tax, valuation or utility expert to advise it in

the complex issues associated with establishing a price for the Pennichuck assets or to examine tax and operational issues. In short, the meetings were of necessity perfunctory because [the City] never engaged in any meaningful due diligence review of the Pennichuck assets. [The City] plainly intended that these meetings create the appearance that the parties were talking about a potential acquisition, when in fact, [the City] made no serious or concerted effort to acquire Pennichuck. Simply put, they were all form and no substance.

The verified petition also states:

As of February 4, 2004, more than fourteen months since the Nashua Board of Aldermen voted to take Pennichuck['s] assets and more than a year since the public referendum, [the City] had failed to file a petition with the PUC seeking authority to condemn Pennichuck's assets. This delay continued despite [the City's] March 26, 2003 statement that it "would now proceed to . . . petition the PUC," and despite more than a dozen subsequent statements to the press that a PUC filing was imminent.

Alderman McCarthy's affidavit states, "Between mid-August and December 2003 there were four meetings between parties and fifteen telephone calls between counsel. Outside counsel for the City itemized one hundred ninety (190) hours of work during this period on all issues related to the project." It continues, "At no time did Pennichuck indicate it declined to negotiate further until it abruptly did so by letter of January 27, 2004, followed by its first lawsuit on February 4, 2004." The affidavit further states, "Following Pennichuck's termination of negotiations and filing of suit, the City moved as quickly as possible in February and March, 2004 to appropriate funds for consultants and counsel to plan for and pursue eminent domain under RSA 38."

The party opposing summary judgment must set forth specific evidence of a genuine issue of material fact. RSA 491:8-a, IV. "Conclusory assertions do not satisfy the burden in opposing summary judgment." *N.E. Tel & Tel Co.*, 141 N.H. at 452. "A dispute of fact is 'genuine' if the evidence is such that a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "An issue of fact is 'material' if it might affect the outcome of the suit." *Horse Pond Fish and Game Club v. Cormier*, 133 N.H. 648, 653 (1990) (citation omitted).

Pennichuck's verified petition was confirmed under oath and expressly incorporated into its cross-motion for summary judgment. Under RSA

491:8-a, III, the trial court was required to consider the evidence contained in the verified petition in deciding summary judgment.

▮ Pennichuck's allegations that the City "never retained a financial, tax, valuation or utility expert" and did not engage in "meaningful due diligence," even if accurate, do not create a genuine issue of material fact. Pennichuck does not dispute the City's evidence that Pennichuck terminated negotiations with the City on January 27, 2004, and that the City filed its condemnation petition within sixty days. Moreover, Pennichuck's verified petition does not dispute the City's evidence that the parties engaged in numerous meetings and telephone calls to negotiate the sale of Pennichuck. When this undisputed evidence is considered in light of Pennichuck's allegations, no reasonable fact finder could have found that the fourteen-month delay in filing was unreasonable. Rather, a reasonable fact finder would have had to find the fourteen-month delay was explained by negotiations and that filing a condemnation petition within sixty days of the date Pennichuck terminated negotiations with the City was reasonable. Thus, the trial court properly found that the City filed its condemnation petition within a reasonable time.

*III. Laches*

Finally, we consider Pennichuck's assertion that the City is barred from filing its condemnation petition by the doctrine of laches. To succeed on a laches claim, the party asserting laches bears the burden of proving that there was unreasonable delay and that prejudice resulted from the delay. *State v. Weeks*, 134 N.H. 237, 240 (1991). Where a party asserts laches against a municipality, it must also show the existence of extraordinary and compelling circumstances. *Town of Seabrook v. Vachon Management*, 144 N.H. 660, 668 (2000).

The trial court found that Pennichuck's laches claim failed as a matter of law and granted summary judgment to the City. The trial court applied our reasoning in *Petition of Bianco*, 143 N.H. 83, 85 (1998), where we refused to allow a plaintiff to assert laches when the parties were actively engaged in negotiations aimed at settlement without litigation. Here, the trial court found that the fourteen-month delay in filing the condemnation petition was reasonable because the City was engaged in negotiations aimed at settlement. It found that "Pennichuck ... cannot seriously claim to have been surprised by the City's PUC filing, as it has been aware at all times that the City was pursuing acquisition of Pennichuck's property." It also found that Pennichuck failed to prove that extraordinary or compelling circumstances existed to permit a laches claim.

We begin our laches analysis by considering whether Pennichuck suffered prejudice. A party must present evidence to explain the alleged prejudice and the evidence must demonstrate more than mere hypothetical and unlikely financial harm. 27A AM JUR. 2D *Equity* § 192 (1996). "For prejudice to apply, the defendant's asserted prejudice claim must be *caused by* or *result from* the complainant's delay in pursuing a claim. Where such causation does not exist between the asserted prejudice and the delay in bringing suit, laches is not applied." 27A AM JUR. 2D *Equity* § 179 (1996) (emphasis added); *accord Murphy v. Timberlane Regional Sch. Dist.*, 973 F.2d 13, 17 (1st Cir. 1992).

Here, while PSC may have terminated merger talks with Pennichuck as a result of the referendum and Pennichuck's shareholders may have lost value as a result of the prospect of condemnation proceedings, Pennichuck offered no evidence to show that the City's delay in filing was the cause of its losses.

■ Pennichuck also offers no evidence of extraordinary or compelling circumstances that would permit a laches claim against the City. Because Pennichuck cannot prove prejudice or extraordinary or compelling circumstances, we need not extend our laches analysis to determine whether the City engaged in unreasonable delay. We hold that the trial court correctly ruled that laches did not apply.

*Affirmed.*

NADEAU, DALIANIS and GALWAY, JJ., concurred.