Hillsborough-southern judicial district'
No. 97-862

## TENNESSEE GAS PIPELINE COMPANY

v.

## TOWN OF HUDSON

December 28, 2000

*Sulloway & Hollis, P.L.L.C.*, of Concord (*Margaret H. Nelson* on the brief and orally), for the plaintiff.

*Upton Sanders & Smith*, of Concord (*Robert Upton II* on the brief and orally), for the defendant.

BROCK, C.J. The plaintiff, Tennessee Gas Pipeline Company (utility), appeals from an order of the Superior Court (*Hollman*, J.) denying a tax abatement for the 1995 tax year relating to its property in Hudson. *See* RSA 76:17 (Supp. 1999). We affirm.

The evidence presented during trial indicates the following. The utility owns and operates a high pressure natural gas pipeline which transmits wholesale natural gas to EnergyNorth Natural Gas, Inc. (EnergyNorth) for distribution to its retail customers. As of April 1, 1995, the utility's taxable property in Hudson consisted of approximately three miles of buried eight-inch pipeline, 1,337 feet of buried six-inch pipeline, twenty acres of associated easements, a metering station, and related items. The Federal Energy Regulatory Commission (FERC) regulates the utility's rate base, *see generally* 15 U.S.C. § 717(c) (1984), which is determined by the original cost less depreciation, or net book cost, of its assets.

In 1991, Avitar Associates of New England, Inc. performed a revaluation of all taxable property within Hudson. As a result, the defendant, the Town of Hudson, assessed the utility's property at $198,500, which the utility appealed. To defend that appeal, the town hired George Sansoucy to value the utility's property. Sansoucy concluded that the value of the utility's property was approximately $891,000. The utility later withdrew its appeal.

The town engaged Sansoucy to revalue all utility property within its boundaries as of April 1, 1993. As a result, in 1995 the town assessed the utility's property at $905,600. Consequently, the utility sought a tax abatement for the 1995 tax year.

At trial, the utility argued that in light of FERC's restrictive regulation, its property should be valued at its net book cost. The town countered that the replacement cost less depreciation method of valuation should be used. The trial court found that the replacement cost method was appropriate and adopted the valuation calculated by the town's expert. This valuation accounted for replacement cost less physical depreciation, with no offset for either functional or economic depreciation. Because the resulting fair market value of $978,234 was greater than the utility's 1995 tax assessment of $905,600, the trial court concluded that the utility had failed to prove that it was being taxed excessively and, therefore, denied its request for an abatement.

On appeal, the utility argues that the trial court erred in: (1) failing to rule that the fair market value of the utility's property is best approximated by its net book value; (2) failing to make any allowance for economic depreciation in its replacement cost less depreciation analysis; (3) adopting a valuation of the utility's easements that was developed in an unconstitutionally discriminatory and non-uniform manner and was otherwise excessive; and (4) failing to invalidate the town's assessment of the utility's property as an illegal spot assessment.

"We sustain the findings and rulings of the trial court unless they are lacking in evidential support or tainted by error of law." *Public Serv. Co. of N.H. v. Town of Bow*, 139 N.H. 105, 107, 649 A.2d 65, 66 (1994) (quotation omitted).

We first address the utility's claim that the trial court's valuation analysis was erroneous as a matter of law.

> As we have repeatedly stated, the trier of fact may use any one or a combination of five appraisal techniques in valuing public utility property: original cost less depreciation (rate base [or net book]), comparable sales, cost of alternative facilities, capitalized earnings, and reproduction cost less depreciation. . . . [T]ypically all relevant factors must be considered, but a trier of fact need not allocate specific weight to any one of the approaches listed. Rather, judgment is the touchstone.

*Southern N.H. Water Co. v. Town of Hudson*, 139 N.H. 139, 141, 649 A.2d 847, 848 (1994) (quotations, citations, and brackets omitted). It is extraordinarily difficult to value public utilities, and we give the trier of fact considerable deference in this area. *See id.* at 142, 649 A.2d at 848.

The trial court's lengthy order reveals a careful consideration of the relevant appraisal methods. For the reasons set forth below, we conclude that the trial court did not err as a matter of law. *See id.* at 141, 649 A.2d at 848.

We reject the utility's argument that it proved that FERC's regulation was so restrictive that its property should be valued at its net book cost. The trial court would be compelled to make such a determination "only if regulation were so extensive as to make it impossible for any utility property to be sold at a price in excess of net book value." *Appeal of Public Serv. Co. of N.H.*, 124 N.H. 479, 485, 471 A.2d 1182, 1185 (1984). If a utility presents evidence demonstrating

the existence of a regulatory regime that effectively restricts a prospective purchaser to a return on the transferred property based on that property's net book value[,] . . . [s]uch a demonstration would create a presumption that market value is equivalent to net book value. The presumption may then be rebutted by the town's coming forward with evidence of other factors that would influence a prospective purchaser: high current reproduction cost, potential for expansion, the remaining useful life of the property, etc.

*Id.* at 485-86, 471 A.2d at 1186 (quotations, citation, and ellipsis omitted).

The evidence supports the trial court's conclusion that the highest and best use of the utility's property is as a gas transmission system, subject to FERC regulation. The utility argues that the property must be valued at its highest and best use, and that because FERC would limit a purchaser to a rate base of the lesser of the seller's rate base or the actual purchase price, its assessment should be based on its rate base, *i.e.*, its net book cost. FERC has

allowed exceptions to this rule, and allowed a purchaser to recover in its rates more than the net book value of the property (*i.e.*, the gain realized by the seller), only when the purchaser has demonstrated that specific dollar benefits resulted directly from the sale. . . . The burden of proof for a utility seeking to demonstrate specific dollar benefits is heavy and may be practically impossible to meet.

*Re Arkla Energy Resources*, 61 F.E.R.C. ¶ 61,004 (1992).

The trial court concluded that the utility failed to prove that FERC regulation necessitated valuing the utility's property at its net book cost. Assuming, without deciding, that the utility demonstrated that FERC would restrict a prospective purchaser to a return on the property based upon the property's net book cost, we affirm the trial court's decision not to value the property at its net book cost "because it reached the correct result and there are valid alternative grounds to reach that result." *Echo Consulting Services v. North Conway Bank*, 140 N.H. 566, 569, 669 A.2d 227, 230 (1995).

■ The evidence of the property's remaining physical life and replacement cost would have compelled the trial court to conclude that the presumption created by evidence demonstrating that FERC regulation necessitated valuing the utility's property at its net book cost was successfully rebutted. *See Appeal of Public Serv.*

*Co. of N.H.*, 124 N.H. at 486, 471 A.2d at 1186. The utility's rate base currently reflects depreciation of more than ninety percent, and the pipeline has most of its useful life ahead of it. Furthermore, the town's expert testified that the pipeline delivers an essential public service to the Hudson area. The utility's expert testified that it probably would be replaced if it were destroyed, and the replacement cost could be included in rate base. Therefore, it is possible that a prospective purchaser would pay more than net book cost as long as the price paid were less than what it would cost to reproduce the same property. *See Public Service Co. v. New Hampton*, 101 N.H. 142, 151, 136 A.2d 591, 598 (1957) (noting that it may be possible to sell a utility at a "fair price" exceeding net book cost). Accordingly, we conclude that the trial court's use of the replacement cost method of valuation was not erroneous.

We also reject the utility's argument that the trial court's failure to allow for economic depreciation was erroneous as a matter of law. As the trial court noted, "economic depreciation is a loss in value from causes outside the property itself, such as governmental regulation." *See Southern N.H. Water Co.*, 139 N.H. at 142, 649 A.2d at 848. Sansoucy, the town's expert, testified to factors that support the trial court's decision not to make an allowance for economic depreciation. For example, he testified that the utility is the only pipeline company serving EnergyNorth in the Merrimack corridor, that the price of gas is high in this area, that the demand for gas is growing, and that gas will become the preferred fuel for industries in southern New Hampshire because it will assist them in meeting the environmental protection agency's air quality requirements for industry. In addition, Sansoucy testified that regulation has the positive effect of making the utility a monopoly with a guaranteed return on its investment.

Although the utility's expert provided conflicting testimony on factors supporting economic depreciation, it was within the discretion of the trial judge to resolve conflicts in the evidence. *See id.* at 141, 649 A.2d at 848. The trial court "could accept or reject such portions of the evidence presented as he found proper, including that of the expert witnesses." *Id.* (quotation omitted). Furthermore, we have "recognized the relevance of economic depreciation, but ha[ve] never attempted to tie the fact finder's hands with a rigid fair market value formula in the absence of legislative directive." *Id.* at 142-43, 649 A.2d at 849. Therefore, because the trial court's valuation is not lacking in evidential support, we do not find it erroneous as a matter of law. *See Public Service Co. of N.H.*, 139 N.H. at 107, 649 A.2d at 66.

■ ■ We also reject the utility's argument that the trial court's adoption of the town's easement values was erroneous as a matter of law. As a preliminary matter, the town contends that the utility lacks standing to complain that many of the easements are assessed to both the utility and the feeholder. When easements are valued, the value of the easement interest is added to the estate of the easement holder and a corresponding reduction is made to the value of the underlying fee. *See Locke Lake Colony Assoc. v. Town of Barnstead*, 126 N.H. 136, 141, 489 A.2d 120, 123-24 (1985). However, "[j]ustice does not require the correction of errors of valuation whose joint effect is not injurious to the appellant." *Appeal of Town of Sunapee*, 126 N.H. 214, 217, 489 A.2d 153, 155 (1985) (quotation omitted). Therefore, the utility has no standing to challenge its assessment on the grounds that the underlying fee holders may be entitled to an abatement.

The utility argues that the town's treatment of its easements violated the principles of uniformity and proportionality of Part I, Article 12 and Part II, Article 5 of the New Hampshire Constitution. It also argues that the town's assessment violated the prohibition on taxation based upon a classification of the property's owner contained in Part II, Article 6 of the New Hampshire Constitution. *See Smith v. N.H. Dep't of Revenue Admin.*, 141 N.H. 681, 686, 692 A.2d 486, 491 (1997). "Together, these three constitutional provisions require that taxation be just, uniform, equal, and proportional." *Id.*

> It is well settled that the test in an abatement case is whether the taxpayer is paying more than his or her proportional share of taxes. The plaintiffs have the burden of proving disproportionality with respect to other property in the town by a preponderance of the evidence. . . . To establish disproportionality, the plaintiffs must show that their assessment is higher than the general level of assessment in the town.

*Appeal of Andrews*, 136 N.H. 61, 64, 611 A.2d 632, 634 (1992) (quotations, citations, and brackets omitted).

■ The utility's argument is "premised on the fact that the value of the easement interest depended on the identity of the taxpayer, whether easement holder or fee holder" and that "[t]his approach constitutes an inconsistent and improper classification." *See* N.H. CONST. pt. I, art. 12, pt. II, arts. 5, 6. In support of this claim, the utility cites the disparity in the values of the easement interests between the assessments of the utility and the underlying fee

holders. We conclude that this disparity, in and of itself, neither implies an unconstitutional classification based upon the identity of the taxpayer, *see Smith*, 141 N.H. at 686, 692 A.2d at 491, nor demonstrates that its assessment is higher than the general level of assessment in the town, *see Appeal of Andrews*, 136 N.H. at 64, 611 A.2d at 634.

The utility argues that the easement values adopted by the trial court include non-taxable items. The utility asserts that this constitutes disproportionate taxation, in violation of our constitution, because the town is taxing property exempt from taxation. Both Sansoucy and the utility's expert increased the base value per acre of the easement for permanent improvements arising from the cost of constructing the pipeline. These permanent land improvements reflect the inherent value of the easement corridor already assembled.

The utility asserts that some of the specific costs Sansoucy included, *e.g.*, legal expenses associated with the transfer of property and the costs of surveys and environmental permits, are not real estate, and therefore should not be included in its assessment. In addition, the utility argues that Sansoucy accounted for some costs associated with the easements twice. We need not decide this issue, however, because any error was harmless. The trial court adopted Sansoucy's revised analysis, ruling that Sansoucy's "entry for permanent improvements accounts for the value of acquiring the 20 acre parcel complete." Sansoucy's revised analysis included an adjustment of $2,500 per acre for permanent improvements. Multiplying $2,500 times twenty acres results in a total of $50,000. Thus, even if we were to disallow the *entire* adjustment for permanent improvements, the trial court's total valuation of the utility's pipeline and easements would only be reduced from $978,234 to $928,234. Since the utility's 1995 tax assessment was $905,600, the utility still would have failed to prove that it was entitled to a tax abatement.

We reject the utility's argument that the trial court's adoption of the town's easement values fails to reflect economic reality and is therefore disproportionate and unreasonable. The utility argues that the trial court's valuation of the easement interests substantially exceeds the earnings which the utility or its probable successor could achieve from the operation of the pipeline itself, and contends that its property should be valued at net book cost. Because we have already concluded that the utility could possibly sell its property in excess of net book cost, the assessment is

reasonable. *See Appeal of Public Serv. Co. of N.H.*, 124 N.H. at 485, 471 A.2d at 1185; *Appeal of Whaland*, 122 N.H. 700, 702, 449 A.2d 1204, 1205 (1982).

The utility next argues that the town's 1995 reassessment of its property was an illegal spot assessment because it was not prompted by an error in the physical description of the property or by a computational error in the revaluation estimate, and therefore it was not authorized by RSA 75:8 (1991).

RSA 75:8 provides that "assessors and selectmen shall, in the month of April in each year, . . . correct all errors that they find in the then existing appraisal." RSA 75:8. The statute does not define "errors." "We give a statutory term that is not defined its plain and ordinary meaning." *Board of Water Comm'rs, Laconia Water Works v. Mooney*, 139 N.H. 621, 626, 660 A.2d 1121, 1125 (1995). The plain and ordinary meaning of "error" is "an act involving an unintentional deviation from truth or accuracy: a mistake in perception, reasoning, recollection, or expression." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 772 (unabridged ed. 1961).

■ We conclude that the town could have reasonably inferred from the four-fold difference between Avitar's appraisal and the appraisal prepared by Sansoucy for the utility's appeal that there was an error in Avitar's appraisals of utility properties. The large difference between the appraisals could have signaled an error in calculation or method of assessment. Accordingly, the town properly revalued all utility property pursuant to RSA 75:8.

■ Finally, we reject the utility's argument that the assessment was invalid because Sansoucy did not obtain approval from the department of revenue administration (DRA) for his contract with the town, as required by statute. *See* RSA 21-J:11 (Supp. 1995). The statute does not provide a specific remedy for violations. *See id.* Therefore, the trial court did not abuse its discretion by refusing to grant remedial relief where such relief is not required.

To the extent the utility has set forth additional claims of error that were not raised in its notice of appeal, we deem those arguments waived. *See State v. Peterson*, 135 N.H. 713, 714-15, 609 A.2d 749, 750-51 (1992).

*Affirmed.*

JOHNSON, J., sat for oral argument but retired prior to the final vote; THAYER, J., sat for oral argument but resigned prior to the final vote; BRODERICK, NADEAU, and DALIANIS, JJ., concurred; HORTON, J., retired, specially assigned under RSA 490:3, con-

curred; NADEAU and DALIANIS, JJ., took part in the final vote by consent of the parties.