Public Utilities Commission
No. 2009-274

## APPEAL OF PENNICHUCK WATER WORKS, INC. & a.
(New Hampshire Public Utilities Commission)

Argued: January 21, 2010
Opinion Issued: March 25, 2010

*Upton & Hatfield, LLP*, of North Conway (*Robert Upton, II* and *Justin C. Richardson* on the brief and orally), and *James M. McNamee*, of Nashua, by brief, for the petitioner.

*McLane, Graf, Raulerson & Middleton, P.A.*, of Concord (*Thomas J. Donovan & a.* on the brief, and *Mr. Donovan* orally), and *Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C.*, of Chattanooga, Tennessee (*Joe A. Conner* and *Misty Smith Kelley* on the brief, and *Mr. Conner* orally), for the respondents.

*Ransmeier & Spellman, P.C.*, of Concord (*John T. Alexander* and *Daniel J. Mullen* on the brief), for intervenor Anheuser-Busch.

*Barbara A.M. Maloney, PLLC*, of Auburn (*Richard J. Maloney* on the brief), for intervenor Business & Industry Association of New Hampshire.

*Wadleigh, Starr & Peters, P.L.L.C.*, of Manchester (*Stephen J. Judge* and *Pierre A. Chabot* on the brief, and *Mr. Judge* orally), for intervenor Merrimack Valley Regional Water District.

*Boutin & Altieri, P.L.L.C.*, of Londonderry (*Edmund J. Boutin* on the brief), for intervenor Town of Merrimack.

*Mitchell Municipal Group, P.A.*, of Laconia (*Laura A. Spector* on the memorandum of law), for intervenor Town of Pittsfield.

DALIANIS, J. Respondent Pennichuck Water Works (PWW) appeals an order of the New Hampshire Public Utilities Commission (PUC) approving the petition filed by the petitioner, City of Nashua (City), in which the City sought to acquire PWW and its affiliates, respondents Pennichuck East Utilities (Pennichuck East) and Pittsfield Aqueduct, Inc. (Pittsfield Aqueduct) (collectively, the Utilities). In approving the City's petition against PWW, the PUC found that the Utilities had failed to rebut the presumption under RSA 38:3 (2000) that acquiring PWW's plant and property was in the public interest. The Utilities now appeal this determination and challenge the imposition of conditions to satisfy the public interest. The City has filed a cross-appeal, contesting the PUC's dismissal of its petition with respect to PWW's affiliates, as well as the PUC's determination of the fair market value of PWW's assets. We affirm.

## I. Background

Before setting forth the facts relevant to the instant appeal, we first summarize the procedures contained in RSA chapter 38. *See Pennichuck*

*Corp. v. City of Nashua,* 152 N.H. 729, 731 (2005). RSA chapter 38 empowers municipalities, with PUC approval and at a value set by the PUC, "to take by eminent domain privately owned electric, gas and water utilities in order to maintain and operate them as publicly owned facilities." *Id.; see* RSA 38:2, I, II (2000). A municipality may move forward with a plan to assume ownership of a privately-owned utility "after 2/3 of the members of the governing body shall have voted." RSA 38:3. This vote must then be confirmed by a majority vote of the municipality's qualified voters at a regular election or special meeting called for this purpose. *Id.; Pennichuck Corp.,* 152 N.H. at 731. A favorable confirming vote creates a rebuttable presumption that the acquisition is in the public interest. *Pennichuck Corp.,* 152 N.H. at 731.

Within thirty days of the confirming vote, the municipality must notify the utility and inquire if it is willing to sell the identified plant and property located within the municipality, as well as "that portion, if any, lying without the municipality which the public interest may require, pursuant to RSA 38:11 as determined by the [PUC]." RSA 38:6 (2000); *Pennichuck Corp.,* 152 N.H. at 731. The utility is given sixty days to respond. RSA 38:7 (2000). When, as in this case, the Utilities indicate their unwillingness to negotiate a sale, "the municipality may proceed to acquire the plant as provided in RSA 38:10." RSA 38:7. RSA 38:10 (2000), in turn, allows the municipality to take the property by condemnation if, after notice and hearing, pursuant to RSA 38:9 (2000), the PUC has determined that the taking is in the public interest. Pursuant to RSA 38:11 (2000), when determining whether the taking is in the public interest, the PUC "may set conditions and issue orders to satisfy the public interest." The PUC also determines the amount of just compensation that the municipality must pay for the assets in question. *Pennichuck Corp.,* 152 N.H. at 731; *see* RSA 38:9, I, III, :10.

In November 2002, by a vote of fourteen to one, the City's board of aldermen decided to establish a municipal water works system and to acquire all or part of the privately-owned water works system serving the City's residents. *Pennichuck Corp.,* 152 N.H. at 732. This resolution was approved by the mayor in December 2002 and confirmed by City voters in January 2003. *Id.* In February 2003, the City notified the Utilities of its intent to acquire them to establish a municipal water works system. *Id.*

PWW is a privately-owned public utility that serves approximately 24,500 customers in the City and ten other municipalities in southern and central New Hampshire, including: Amherst, Bedford, Derry, Epping, Hollis, Merrimack, Milford, Newmarket, Plaistow and Salem. It is the largest investor-owned water utility in the state. Pennichuck East provides water service to approximately 4,900 customers in twelve municipalities in southern and central New Hampshire, including: Atkinson, Bow, Derry,

Hooksett, Lee, Litchfield, Londonderry, Pelham, Plaistow, Raymond, Sandown and Windham. When Pittsfield Aqueduct received the notice from the City, it served customers in Pittsfield; it has since expanded to serve customers in Barnstead, Conway and Middleton. PWW, Pennichuck East and Pittsfield Aqueduct are separate corporate entities; only PWW is engaged in the sale of water in the City.

The City and the Utilities entered into negotiations concerning the terms of a possible sale of some or all of the Utilities' assets. *Pennichuck Corp.,* 152 N.H. at 732. On November 30, 2003, the City made a formal offer to purchase the Utilities' assets for $121 million. *Id.* The Utilities rejected this offer in December 2003 and terminated negotiations in January 2004. *Id.*

The Utilities, thereafter, filed suit in superior court, seeking a declaratory judgment to terminate or limit the City's condemnation efforts. *Id.* The superior court rendered its decision in August 2004, granting summary judgment in favor of the City. We affirmed the trial court's decision. *Id.* at 730-31.

Approximately one month after the Utilities filed their declaratory judgment action, the City filed a condemnation petition with the PUC, asking it to find that the condemnation of the Utilities' assets was in the public interest and to determine damages. *Id.* at 732. On January 31, 2005, the PUC dismissed the City's petition against Pennichuck East and Pittsfield Aqueduct, ruling that the City could not condemn the property of these utilities because they did not provide water service to City residents. The PUC ruled, however, that the City could continue its condemnation proceeding against PWW. In so ruling, the PUC emphasized that it had not yet determined whether condemnation of any of PWW's assets was in the public interest.

After the parties engaged in extensive discovery and motion practice, the PUC heard the merits of the City's petition over two days in January 2007 and ten days in September 2007. On July 25, 2008, two of the PUC's commissioners, Thomas B. Getz and Graham J. Morrison, issued a lengthy order: (1) finding that PWW had failed to rebut the presumption that the taking of its property within the City's borders was in the public interest; (2) finding that the City had demonstrated that the taking of PWW's property outside of the City's borders was in the public interest provided that the City continues to operate the entire PWW system according to a unified rate structure and provides all customers with the same quantity and quality of water; (3) determining that the fair market value of the assets in question was $203 million as of December 31, 2008; and (4) conditioning approval of the City's petition upon the City fulfilling nine conditions, including the creation of a mitigation fund of $40 million to reimburse customers of PWW's other subsidiaries for the loss of the

affiliation with PWW. A third PUC commissioner, Clifton C. Below, concurred with respect to the other commissioners' public interest determinations and imposition of conditions, but dissented with respect to their valuation of PWW's assets. The third commissioner calculated the fair market value of PWW's assets as $151 million plus the addition of $40 million for a mitigation fund for impacts to the customers of PWW's affiliates.

The Utilities and the City moved for rehearing. On March 13, 2009, Commissioners Getz and Morrison denied these motions for rehearing. Commissioner Below stated that he would have granted rehearing on the issue of whether the PUC erred by using the price a hypothetical not-for-profit municipal buyer would pay for PWW as a foundation for its valuation determination.

In their appeal, the Utilities argue that: (1) the conditions imposed by the PUC exceed its statutory authority because enforcing them requires it to exercise jurisdiction over the City in violation of RSA 362:4 (2009); (2) by imposing conditions, the PUC violated PWW's procedural due process rights; (3) the PUC failed to weigh the benefits and burdens of the proposed taking, as required by the New Hampshire Constitution; (4) the PUC failed to set forth its methodology; and (5) although the evidence supports the need for a mitigation fund, it does not support a finding that $40 million would be sufficient to generate the necessary revenue. In its cross-appeal, the City contends that the PUC erroneously: (1) calculated the fair market value of PWW based upon a flawed theory; (2) dismissed the City's petition to acquire the assets of Pennichuck East and Pittsfield Aqueduct; and (3) required a mitigation fund of double the combined values and revenues of Pennichuck East and Pittsfield Aqueduct.

In addition to the parties, five intervenors have filed appellate briefs: Anheuser-Busch, Business & Industry Association of New Hampshire (BIA), Merrimack Valley Regional Water District (Merrimack Valley), and the Towns of Merrimack and Pittsfield. Briefly summarized, their positions are as follows: Anheuser-Busch urges us to uphold the conditions imposed by the PUC upon the City's operation of PWW; BIA opposes the City's petition to take PWW and argues that we should reverse the PUC's finding that this taking is in the public interest; Merrimack Valley, the entity to which the City's initial petition indicated it would convey PWW, challenges the PUC's valuation of PWW; the Town of Merrimack opposes the City's petition to take PWW and argues that the PUC's public interest finding is wrong; and, finally, the Town of Pittsfield urges us to uphold the PUC's establishment of the $40 million mitigation fund.

*II. Standard of Review*

A party seeking to set aside an order of the PUC has the burden of demonstrating that the order is contrary to law or, by a clear preponderance of the evidence, that the order is unjust or unreasonable. RSA 541:13 (2007); *see Appeal of Verizon New England,* 153 N.H. 50, 56 (2005). Findings of fact by the PUC are presumed *prima facie* lawful and reasonable. RSA 541:13; *see Appeal of Verizon New England,* 153 N.H. at 56. The appealing party may overcome this presumption only by showing that there was *no* evidence from which the PUC could conclude as it did. *Legislative Utility Consumers' Council v. Public Utilities Comm'n,* 118 N.H. 93, 99 (1978); *see Appeal of Basani,* 149 N.H. 259, 262 (2003). Further, because the PUC is not bound by the technical rules of evidence, the admission of hearsay or technically irrelevant or immaterial evidence is insufficient to render its order unjust, unreasonable, or unlawful. *Appeal of McKenney,* 120 N.H. 77, 81 (1980); *see* RSA 541:17 (2007).

Additionally, in arriving at its conclusions, the PUC may rely not only upon the evidence presented, but also upon its own expertise and that of its staff. *New England Tel. & Tel. Co. v. State,* 113 N.H. 92, 101-02 (1973). It is not compelled to accept the opinion evidence of any one witness or group of witnesses. *Id.* at 102. "Whether it should rely upon the expert testimony presented by staff witnesses in preference to that offered by the company is a matter for its judgment based upon the evidence presented." *Id.*

We deferentially review PUC orders such as the one at issue. *See Appeal of Verizon New England,* 158 N.H. 693, 695 (2009). "When we are reviewing agency orders which seek to balance competing economic interests, or which anticipate such an administrative resolution, our responsibility is not to supplant the PUC's balance of interests with one more nearly to our liking." *Id.* (quotation, ellipsis and brackets omitted). "The statutory presumption, and the corresponding obligation of judicial deference are the more acute when we recognize that discretionary choices of policy necessarily affect such decisions, and that the legislature has entrusted such policy to the informed judgment of the [PUC] and not to the preference of reviewing courts." *Appeal of Conservation Law Foundation,* 127 N.H. 606, 616 (1986) (quotation omitted). While we give the PUC's policy choices considerable deference, we do not defer to its statutory interpretation; we review the PUC's statutory interpretation *de novo. See Appeal of Verizon New England,* 158 N.H. at 695.

## III. Analysis

### A. Dismissal of Petition to Acquire PWW's Affiliates

We first address whether the PUC erred by dismissing the City's petition to acquire the assets of Pennichuck East and Pittsfield Aqueduct (PWW's corporate affiliates servicing customers in towns and cities other than the City). The Utilities assert that the City failed to preserve its argument because it did not ask the PUC to reconsider its dismissal until after the final order on the merits was issued. *See* RSA 541:3 (2007) (motions for rehearing must be filed within thirty days of agency order). We assume, without deciding, that the City's motion for rehearing was sufficient to preserve its argument, and proceed to analyze its merits.

■ Because "[i]t is fundamental that a legislative grant of power to condemn for a public use, being derogatory of common right, may be exercised only within the clear definition of the grant," and this "definition is bounded by the express words or the necessary implication of those words," we begin by examining the language of pertinent provisions of RSA chapter 38 governing the power of a municipality to take property from a privately-owned public utility. *Interstate Bridge &c. v. Ham*, 91 N.H. 179, 181 (1940).

In matters of statutory interpretation, we are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. *Zorn v. Demetri*, 158 N.H. 437, 438 (2009). We interpret statutes not in isolation, but in the context of the overall statutory scheme. *Appeal of Ashland Elec. Dept.*, 141 N.H. 336, 340 (1996). Our analysis must start with consideration of the plain meaning of the relevant statutes, construing them, where reasonably possible, to effectuate their underlying policies. *Nashua School Dist. v. State*, 140 N.H. 457, 458 (1995). Insofar as reasonably possible, we will construe the various statutory provisions harmoniously. *Id.*

■ RSA 38:2, I, empowers a municipality to "take . . . or otherwise acquire and maintain and operate . . . one or more suitable plants for the . . . distribution of . . . water for municipal use, for the use of its inhabitants and others, and for such other purposes as may be permitted . . . by the [PUC]." RSA 38:3 enables a municipality to move forward to "establish such a plant" after two-thirds "of the members of the governing body shall have voted . . . that it is expedient to do so" and after this action is confirmed by a majority of qualified voters. Under RSA 38:6, "[w]ithin 30 days after the confirming vote . . . the governing body shall notify in writing any utility engaged, at the time of the vote, in generating or distributing . . . water for sale in the municipality, of the vote." RSA 38:6 allows the municipality to "purchase all

or such portion of the utility's plant and property located within such municipality that the governing body determines to be necessary for the municipal utility service." Under RSA 38:6, the municipality "shall purchase that portion, if any, lying without the municipality which the public interest may require, pursuant to RSA 38:11 as determined by the [PUC]."

▮ Giving these words their plain meaning, we agree with the PUC that these statutes allow a municipality only to take by eminent domain a privately-owned water utility that is "engaged, at the time of the vote, in generating or distributing . . . water for sale in the municipality." RSA 38:6. As it is undisputed that, of the three utilities, only PWW was engaged in distributing water for sale in the City, we agree with the PUC that the City may take only PWW's assets by eminent domain, and may not take the assets of Pennichuck East and Pittsfield Aqueduct, the other separately incorporated entities that indisputably have not been engaged in distributing water for sale in the City.

In arguing for a contrary result, the City focuses upon RSA 38:2, I, which allows it to take a plant for the distribution of water "for municipal use, for the use of its inhabitants and others, and for such other purposes" as the PUC may permit. We do not interpret RSA 38:2, I, to allow a municipality to take a utility that is not engaged at all in serving municipal residents. RSA 38:2, I, authorizes the taking of a plant "for the use of [the municipality's] inhabitants and others." Reading this language together with RSA 38:6, we conclude that these statutes allow a municipality to take a utility that is engaged, at least in part, in servicing a municipality's own residents. Here, it is undisputed that neither Pennichuck East nor Pittsfield Aqueduct has ever serviced City residents. Accordingly, RSA 38:2, I, and RSA 38:6 do not allow the City to take these utilities.

*B. Public Interest Finding*

▮ We next address the PUC's finding that the City's taking of PWW's assets is in the public interest. RSA 38:3 creates a rebuttable presumption that a municipality's acquisition of a privately-owned utility is in the public interest. *See Pennichuck Corp.*, 152 N.H. at 731. The PUC ruled, and the parties do not dispute, that this presumption applies only to the City's taking of PWW's assets located within the City. The PUC found that those opposing the City's petition failed to rebut the presumption. With respect to PWW assets located outside of the City, the PUC ruled that the City had demonstrated that taking these assets was in the public interest.

The Utilities first argue that the PUC erred when it found that they failed to rebut the presumption that the City's taking of PWW's assets within the City was in the public interest. In effect, they argue that because

they presented some evidence that the taking was not in the public interest, the presumption should have disappeared, and the PUC should have determined, *de novo*, that the taking was not in the public interest.

■ There are two theories of presumptions. *Cunningham, Adm'x v. Manchester Fire Dep't*, 129 N.H. 232, 235 (1987); *see* N.H. R. EV. 301 Reporter's Notes. The first theory, the Thayer theory, "holds that the only effect of a presumption is to shift the burden of producing evidence with regard to the presumed fact. If that evidence is produced by the adversary, the presumption is spent and disappears." *Cunningham*, 129 N.H. at 235 (quotation omitted); *see* 2 G. DIX ET AL., MCCORMICK ON EVIDENCE § 344, at 508 (Kenneth S. Broun ed., 6th ed. 2006). The second theory, the Morgan theory, "holds that the strong social policy reasons underlying some presumptions may persist despite the introduction of some evidence tending to rebut the existence of the presumed fact. In such situations, the presumption should act to shift the burden of persuasion, as well as the burden of producing evidence." *Cunningham*, 129 N.H. at 236; *see* DIX ET AL., *supra* § 344, at 509, 517. "The opponent of the presumption must then demonstrate the non-existence of the presumed fact by at least a preponderance of the evidence, if not by a greater standard." *Cunningham*, 129 N.H. at 236. "A Morgan theory presumption thus operates with a weight commensurate with the policy considerations that the presumption embodies. In general, jurisdictions will adopt the Morgan theory of the effect of a particular presumption when the legislature or judiciary wishes to implement a significant policy objective." *Id.*

■ Although the rules of evidence do not govern PUC proceedings, *see* RSA 541:17, we find this discussion of the different theories of presumption instructive. Here, because RSA 38:3 reflects the legislature's significant policy objectives in favor of allowing municipalities to take over an existing water distribution system, we conclude that the presumption contained in RSA 38:3 is governed by the Morgan theory. *See* SENATE COMM. ON EXECUTIVE DEPARTMENTS AND ADMINISTRATION, HR'G ON HB 528 1-3 (April 21, 1997); *State v. City of Dover*, 153 N.H. 181, 190 (2006) (recognizing that "[t]he purpose of RSA chapter 38 is to empower municipalities to take by eminent domain privately owned . . . utilities in order to maintain and operate them as publicly owned facilities"). Accordingly, to rebut this presumption, those opposing the City's petition to acquire PWW had to demonstrate, by at least a preponderance of the evidence, that the proposed taking was not in the public interest. *See Cunningham*, 129 N.H. at 236. Based upon our review of the record, we cannot say that the PUC's determination that the opponents to the City's petition failed to meet this standard was unjust or unreasonable.

The Utilities next argue that the PUC failed to set forth its reasoning or methodology. They imply that the PUC's order, is, therefore, insufficient for appellate review. *See Appeal of Town of Newington*, 149 N.H. 347, 352 (2003). The PUC devoted no fewer than thirty-six pages of its 120-page order to the public interest issue. The PUC exhaustively described all of the evidence submitted by the parties on this issue and then carefully analyzed whether, with respect to the taking of PWW assets located within the City, there was sufficient evidence to rebut the presumption that the taking of such assets is in the public interest, and whether, with respect to the taking of PWW assets located outside of the City, the City established that the taking of these assets is in the public interest. Because of the thoroughness with which the PUC order discussed the public interest issue, we have no difficulty in discerning the PUC's findings or its underlying reasoning. Accordingly, we conclude that the PUC's order is more than sufficient for our review. *See id.*

■ The Utilities and the Town of Merrimack also assert that the PUC failed to conduct the net public benefit analysis, which was constitutionally required. Part I, Article 12 of the State Constitution limits exercise of the eminent domain power to "public uses," which has been interpreted to require a showing of a public purpose for any taking and of a probable net benefit to the public if a taking occurs for the intended purpose. *Appeal of Cheney*, 130 N.H. 589, 595 (1988). "Public purpose" and "probable net benefit to the public" are related concepts. *See Merrill v. City of Manchester*, 127 N.H. 234, 236-37 (1985). As we have previously explained:

> Whether a particular use is a public use is a question of law to be resolved by the courts. In gauging the constitutionality of a proposed condemnation, we must determine whether the expenditures will be primarily of benefit to private persons or private uses, which is forbidden, or whether they will serve public purposes for the accomplishment of which public money may properly be used.
>
> In determining whether the purpose for which property is being condemned is a public use, we must accordingly consider the extent to which the proposed project will benefit the public. The net benefit to the public will consist of the benefits of the proposed project and the benefits of the eradication of any harmful characteristics of the property in its present form, reduced by the social costs of the loss of the property in its present form. If the social costs exceed the probable benefits, then the project cannot be said to be built for a public use. In such a case, the true benefits of the project will accrue only to its private

sponsors and participants, and the use of the power of eminent domain will violate the public use requirement of part I, article 12 of the State Constitution.

*Id.* at 236-37 (citations and quotation omitted).

 In this case, unlike many other eminent domain proceedings, the public purpose of the taking is unassailable and undisputed. As the PUC noted, it is a given "[t]hat the provision of public water supply is a public purpose of constitutional sufficiency." *Cf. Public Service Co. v. Shannon*, 105 N.H. 67, 69 (1963) ("It has long been established that supplying electricity is a public purpose for which the power of condemnation may be delegated."). As the PUC further observed, "this is not a proceeding in which the underlying purpose of the proposed taking is being challenged as insufficiently public (as distinct from private) in nature to raise constitutional difficulties."

The record in this case reveals that, contrary to the assertions of the Utilities and the Town of Merrimack, the PUC considered and weighed all of the evidence before it regarding whether the taking was in the public interest. For instance, the Utilities contend that the PUC "never weighed evidence . . . concerning Pennichuck's positive record as a utility and its willingness to expand into new areas." (Quotations and brackets omitted.) The record shows, however, that the PUC considered this evidence and found it unpersuasive. The PUC stated that it did not agree with the Utilities that "because PWW, in conjunction with its regulated affiliates . . . , is a successful regional utility the public interest would not be served by allowing a municipality to acquire it."

The Utilities likewise contend that the PUC "never weighed the damage to the public interest of the state as a whole from losing access to the state's largest investor-owned regional water company, with the capital and operational capability necessary to assist and take over troubled water systems statewide." The record shows, however, that the PUC considered this evidence and rejected it as speculative. The PUC stated that while "[i]t is laudable that [PWW] and its subsidiaries have been willing to expand into new areas when that result was consistent with good public policy, . . . ultimately an investor-owned utility cannot be expected to do so unless such a decision is in the best interests of shareholders, who expect to maximize return on their investment within certain risk parameters." The PUC observed that while the evidence suggested that PWW was more willing than the City "to acquire troubled water systems," this evidence was merely speculative.

Similarly, the Town of Merrimack argues that the PUC ignored evidence that the City's ownership of PWW "would interject a political element into

the operation of a water system not to the benefit of those communities that cannot elect those politicians." To the contrary, the PUC expressly considered this assertion and rejected it, noting that "[i]t would be inappropriate for us to adopt such a skeptical view of the ability of elected officials to make good decisions."

In short, the record shows that the PUC considered all of the evidence before it and engaged in the proper analysis to determine whether the taking at issue was in the public interest. We decline the invitation of the Utilities and the Town of Merrimack to "supplant the PUC's balance of interests with one more nearly to our liking." *Appeal of Verizon New England*, 158 N.H. at 695 (quotation and brackets omitted). In effect, the Utilities and the Town of Merrimack contend that the PUC failed to accord proper weight to their evidence that the City's taking was not in the public interest. It is the PUC's duty to determine the proper weight to be given to evidence. *See Appeal of McKenney*, 120 N.H. at 81. This court does not sit as a trier of fact when reviewing PUC orders. *Id.*

### C. Conditions

We next address whether the conditions the PUC imposed upon the conveyance at issue were lawful. The PUC imposed nine conditions upon its approval of the City's taking of PWW, which required the City to: (1) provide service to all customers within the current PWW territory, regardless of location, with the same service at the same rates, terms and conditions; (2) provide service to all PWW's wholesale users in accordance with the rates, terms and conditions of all existing wholesale contracts; (3) not bifurcate its customer service functions and amend its contract with its contractor to provide that this contractor handle all customer inquiries; (4) have technical advisors on call twenty-four hours per day; (5) make technical water treatment process information available electronically daily or more frequently, upon request from any customer; (6) establish a technical advisory board to provide recommendations concerning technical operations and policies related to the water system; (7) establish a mitigation fund to account for the costs ultimately incurred by PWW's other utility subsidiaries arising out of the loss of their affiliation with PWW; (8) submit for PUC approval its agreements with its contractors incorporating these conditions; and (9) participate as an operator in the underground utility damage prevention system known as "Digsafe" as described in RSA 374:48-:56 (2009). Of these nine conditions, the City proposed seven.

The Utilities first assert that the nine conditions exceeded the PUC's statutory authority because enforcing them will require it to exercise its jurisdiction over the City after the conveyance occurs, which, they contend,

violates RSA chapter 362. We interpret the pertinent statutes in the context of the overall statutory scheme. *Appeal of Ashland Elec. Dept.*, 141 N.H. at 340. We start with the plain meaning of the relevant statutes, construing them, where reasonably possible, harmoniously to effectuate their underlying policies. *Nashua School Dist.*, 140 N.H. at 458.

The PUC has "general supervision of all public utilities and the plants owned, operated or controlled by the same." RSA 374:3 (2009). Generally, any entity that owns or operates a water system or part thereof is deemed a "public utility." RSA 362:4, I (2009). A municipal corporation, however, that operates solely within its corporate limits, is not a "public utility" subject to the PUC's jurisdiction. RSA 362:2, I (2009). A municipal corporation that provides water services outside of its boundaries is also not a "public utility" for the purpose of accounting, reporting or auditing functions. RSA 362:4, II (2009). A municipal corporation that provides water service outside of its boundaries is not a "public utility" for other purposes if: (1) it charges "new customers" outside municipal boundaries "a rate no higher than 15 percent above that charged to its municipal customers . . . and serves those customers a quantity and quality of water or a level of water service equal to that served to customers within the municipality"; or (2) it supplies bulk water to another municipality. RSA 362:4, III-a(a) (2009).

Although municipal water companies that are already in operation are generally not "public utilities" subject to the PUC's jurisdiction, a municipality that seeks to establish, expand, take or otherwise acquire, maintain and operate a plant to distribute water *is* subject to the PUC's jurisdiction as set forth in RSA chapter 38. *See* RSA 38:2; *see also* RSA 374:22 (2009) (requiring *any* entity seeking to operate as a public utility in New Hampshire to first obtain permission and approval from the PUC). RSA chapter 38 "sets forth in great detail the procedures a municipal utility must follow before acquiring or constructing 'a plant.' " *Appeal of Ashland Elec. Dept.*, 141 N.H. at 340.

Several provisions within RSA chapter 38 require the PUC to oversee specific aspects of such an acquisition. For instance, RSA 38:6 requires the PUC to determine the portion of the utility's plant and property located outside of the municipality that the public interest may require the municipality to purchase. Additionally, RSA 38:9, III requires the PUC, upon petition, to "fix the price to be paid for such plant and property" and to "determine the amount of damages, if any, caused by the severance of the plant and property proposed to be purchased from the other plant and property of the owner." Further, RSA 38:11 allows the PUC to "set conditions and issue orders to satisfy the public interest" when the PUC determines whether the purchase or taking is in the public interest.

The Utilities argue, in effect, that notwithstanding the broad grant of authority in RSA 38:11, the PUC may not enforce any conditions that would require it to exercise jurisdiction over a municipality after municipal purchase or taking of a public utility, unless, after the purchase or taking occurs, the municipality will qualify as a regulated public utility under RSA chapter 362. The plain language of RSA 38:11 does not support this construction. Nothing in RSA 38:11 precludes the PUC from imposing conditions upon municipal purchase or taking of a public utility unless the municipality will, after the purchase or taking, qualify as a regulated public utility. Had the legislature intended to limit the PUC's authority in the way the Utilities suggest, it could have so stated. We will not imply a limitation when the legislature has not expressly created one.

The Utilities' construction would also lead to an anomalous result. Under the Utilities' interpretation, the PUC would have the authority to impose conditions upon a municipality's taking or acquisition of a water distribution system, but would lack any authority to enforce them unless, after the acquisition or taking, the municipality happened to fall within the small group of municipalities that qualify as "public utilities" under RSA chapter 362. In this way, the Utilities' construction of the statutes renders RSA 38:11 virtually meaningless.

The Utilities' argument is also contrary to our well-settled rule of statutory construction "that in the case of conflicting statutory provisions, the specific statute controls over the general statute." *Appeal of Plantier*, 126 N.H. 500, 510 (1985) (quotation omitted). Here, to the extent that RSA chapter 362 conflicts with RSA chapter 38, RSA chapter 38 specifically governs municipal establishment, expansion, or acquisition of electric, gas or water distribution plants.

Our decision in *Appeal of Ashland Electric Department*, 141 N.H. at 340-41, is instructive. In that case, the petitioner, Ashland Electric Department (Ashland), was a municipal electric utility that provided electrical service to most, but not all, of the town. *Appeal of Ashland Elec. Dept.*, 141 N.H. at 337-38. A rural electric cooperative provided service to the areas Ashland did not service. *Id.* at 337-38. The town decided to expand Ashland's service area and voted to acquire the rural electric cooperative's distribution plant. *Id.* at 338. When the rural electric cooperative responded that it was unwilling to sell, the town chose not to take the property by eminent domain, but instead decided to build its own distribution plant to service the customers currently served by the cooperative. *Id.* Ashland asked the PUC to declare that it could expand its service area within town limits without prior PUC approval pursuant to RSA chapter 38. *Id.* The PUC denied this request, and we affirmed the PUC's ruling. *Id.* at 337, 338.

Ashland argued that because it was a municipal utility that generally was not subject to PUC jurisdiction, the PUC had no authority to regulate its proposed expansion within its own borders. *Id.* at 339. We rejected this assertion in part because it violated provisions within RSA chapter 38. *Id.* at 340. RSA chapter 38, we explained, governs whenever a municipality or municipal utility seeks to acquire or construct a distribution plant within territory served by a public utility. *Id.* Although as a municipal utility, Ashland was not generally subject to PUC jurisdiction, it became subject to this jurisdiction once it decided to build a distribution plant in territory served by a public utility. *See id.*

■ Similarly, here, although the City would not normally be subject to PUC jurisdiction if it operated its own water system, the City's taking of a public utility by eminent domain *is* subject to the PUC's jurisdiction. *See* RSA 38:2, :3. As part of the oversight authority expressly granted to it by RSA chapter 38 generally and RSA 38:11 specifically, the PUC may condition its approval of the acquisition upon the City's fulfillment of certain prerequisites, even though, after the acquisition, the City will not operate as a "public utility" under RSA chapter 362. *See* RSA 38:11.

The Utilities also argue that the conditions imposed left the Utilities and the public "with no recourse . . . if the PUC later determines that the $40 million fund has structural defects or will not yield sufficient annual revenues" or if the PUC "is faced with the reality of significant, but necessary, cost changes to contractor agreements . . . such that it has an impact on rates and renders the taking no longer in the public interest." The fact that the conditions themselves do not describe the avenues of recourse that may be available should the City violate the conditions or should compliance with them require additional PUC action does not mean that no avenue of recourse exists. Nothing in the language of the conditions abrogates any existing administrative or legal remedy.

The Utilities next argue that the nine conditions are unconstitutional because, by imposing them, the PUC deprived the Utilities of their federal and state constitutional procedural due process rights. *See* U.S. CONST. amends. V, XIV; N.H. CONST. pt. I, art. 15. They contend that the PUC violated their rights to procedural due process because the PUC: (1) "exceeded its quasi-judicial obligation to serve as a neutral arbiter of the public interest . . . and to adjudicate the proposal before it" and "[i]nstead, . . . performed as a super-legislature"; and (2) deprived the Utilities "of [their] due process right to address proposals that varied significantly from the one [the City] made in its petition and its prefiled testimony." We address each argument in turn. Although the Utilities have raised these arguments under both the State and Federal Constitutions, we first

address them under the State Constitution, and cite federal opinions for guidance only. *State v. Ball*, 124 N.H. 226, 231-33 (1983).

■ We interpret the Utilities' first argument to assert that the PUC violated the Utilities' due process rights because it did not act impartially. *See* N.H. CONST. pt. I, art. 15; U.S. CONST. amend. XIV. Due process requires a hearing before a fair and impartial decision-maker. *Appeal of Beyer*, 122 N.H. 934, 939 (1982); *see Petition of Betty Sprague*, 132 N.H. 250, 266 (1989) ("An impartial tribunal is an essential element of a fair hearing."). Administrative officials who serve in an adjudicatory capacity are presumed to be of conscience and capable of reaching a just and fair result. *Appeal of Dell*, 140 N.H. 484, 492 (1995). The burden is upon the party alleging bias to present sufficient evidence to rebut this presumption. *Id.* The fact that the PUC imposed conditions, as RSA 38:11 expressly allows it to do, is not sufficient to rebut the presumption that the PUC was a fair and impartial decision-maker. *See id.* at 492-93; *Petition of Betty Sprague*, 132 N.H. at 266. Accordingly, we reject the Utilities' assertion that the PUC failed to be impartial when deciding the City's petition.

■ In their next argument, the Utilities essentially claim that the PUC deprived them of an opportunity to be heard with respect to the conditions the PUC imposed. "Where governmental action would affect a legally protected interest, the due process clause of the New Hampshire Constitution guarantees to the holder of the interest the right to be heard at a meaningful time and in a meaningful manner." *Appeal of N.H. Fireworks*, 151 N.H. 335, 338 (2004) (quotation omitted).

■ This argument lacks merit. The record demonstrates that the concerns, which prompted the PUC to impose the nine conditions, were well vetted throughout the proceeding. For instance, one of the concerns, raised by PUC staff, related to the allocation of customer service functions between City employees and the City's contractor. In light of this concern, the PUC imposed a condition that precluded the City from bifurcating its customer service functions and required it to amend its contract with its contractor to provide that this contractor handle all customer inquiries. Another concern, also raised by PUC staff, related to whether the City would commit to complying with the Digsafe program. *See* RSA 374:48-:56. In response to the data request from PUC staff, the City stated that it "will become a member of and participate in the Dig Safe program for its water utility." In light of this concern, the PUC imposed a condition that required the City to participate in the Digsafe program. Indeed, most of the nine conditions were specifically proposed by the City to address PUC staff concerns. The record demonstrates that the Utilities had ample opportu-

nity to be heard about the concerns and the proposed solutions to them. Under these circumstances, we conclude that, in imposing the nine conditions, the PUC did not deprive the Utilities of their constitutional right to an opportunity to be heard.

The Federal Constitution offers the Utilities no greater protection than does the State Constitution with respect to the right to a neutral decision-maker, *see Appeal of Grimm*, 141 N.H. 719, 720-22 (1997); *Withrow v. Larkin*, 421 U.S. 35, 46-47 (1975), and the right to an opportunity to be heard, *see Society for Protection of N.H. Forests v. Site Evaluation Comm.*, 115 N.H. 163, 168-69 (1975); *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970). Accordingly, we reach the same results under the Federal Constitution as we do under the State Constitution.

### D. Valuation

We next address whether the PUC erroneously valued PWW's assets. In this proceeding, the PUC was required to determine the amount of "just compensation" or damages that the City would have to pay for PWW's assets. *See Pennichuck Corp.*, 152 N.H. at 731; RSA 38:9, I, III, :10. The parties agree that the standard for "just compensation" is fair market value. *See Opinion of the Justices*, 131 N.H. 504, 510 (1989). Fair market value is "the price which in all probability would have been arrived at by fair negotiations between an owner willing to sell and a purchaser desiring to buy, taking into account all considerations that fairly might be brought forward and reasonably be given substantial weight in such bargaining." *Daly v. State*, 150 N.H. 277, 279 (2003) (quotation omitted); *cf. Public Service Co. v. New Hampton*, 101 N.H. 142, 146 (1957) (property must be taxed at its "full and true value," which is "the price which the property will bring in a fair market, after reasonable efforts have been made to find the purchaser who will give the highest price for it" (quotations omitted)); *Public Serv. Co. of N.H. v. Town of Seabrook*, 126 N.H. 740, 742 (1985).

"[T]he search for fair market value is not an easy one, and is akin to a snipe hunt carried on at midnight on a moonless landscape." *590 Realty Co. Ltd. v. City of Keene*, 122 N.H. 284, 285 (1982) (quotation omitted). "Determination of fair market value is an issue of fact . . . ." *Society Hill at Merrimack Condo. Assoc. v. Town of Merrimack*, 139 N.H. 253, 255 (1994). We have previously recognized "the extraordinary difficulties in placing a fair market value on the property of a regulated utility." *Public Serv. Co. v. Town of Ashland*, 117 N.H. 635, 638 (1977); *see Public Service Co.*, 101 N.H. at 146. Because of this difficulty, "we give the trier of fact considerable deference in this area." *Tennessee Gas Pipeline Co. v. Town of Hudson*, 145 N.H. 598, 600 (2000).

The trier of fact may use any one or a combination of five appraisal techniques in valuing public utility property: original cost less depreciation (rate base or net book), comparable sales, cost of alternative facilities, capitalized earnings, and reproduction cost less depreciation. *Id.* "Typically all relevant factors must be considered, but a trier of fact need not allocate specific weight to any one of the approaches listed." *Id.* (quotation omitted). All of the enumerated approaches are valid, but all also have weaknesses. *Public Serv. Co.*, 117 N.H. at 638. "[W]e have . . . never attempted to tie the fact finder's hands with a rigid fair market value formula in the absence of legislative directive." *Tennessee Gas Pipeline Co.*, 145 N.H. at 602 (quotation and brackets omitted). "Rather, judgment is the touchstone." *Id.* at 600 (quotation omitted).

Experts for both the City and the Utilities considered three approaches to valuing PWW's assets: the reproduction cost less depreciation approach, comparable sales approach, and capitalized earnings approach. We briefly describe each approach.

In the reproduction cost less depreciation approach, also known as the cost approach, "a value . . . is derived for the fee simple interest in a property by estimating the current cost to construct a reproduction of (or replacement for) the existing structure, including an entrepreneurial incentive; deducting depreciation from total cost; and adding the estimated land value." APPRAISAL INSTITUTE, THE APPRAISAL OF REAL ESTATE 378 (13th ed. 2008). The sales comparison approach derives value for the subject property "by comparing similar properties that have recently been sold with the property being appraised, identifying appropriate units of comparison, and making adjustments to the sale prices (or unit prices, as appropriate) of the comparable properties, based on relevant, market-derived elements of comparison." *Id.* at 297. In the capitalized earnings approach, otherwise known as the income capitalization approach, "an appraiser analyzes a property's capacity to generate future benefits and capitalizes the income into an indication of present value." *Id.* at 445.

Although experts for the parties considered all three approaches in their analyses, they weighted them differently. The City's experts gave no weight to the reproduction cost less depreciation approach; the Utilities' experts gave no weight to the comparable sales approach. The City's experts gave the comparable sales and capitalized earnings approaches equal weight; the Utilities' experts weighted the reproduction cost less depreciation approach 60% and the capitalized earnings approach 40%. Additionally, while the experts for both sides included not-for-profit entities within their pool of potential hypothetical buyers when using the capitalized earnings

approach, the City's experts assumed that the presence of these entities would not affect the market, while the Utilities' experts assumed that they would.

Recognizing that each approach has weaknesses, *see Public Serv. Co.*, 117 N.H. at 638, and requires adjustments to "overcome items of value not inherently included in it," the PUC declined to treat one approach as conclusive, and, instead, evaluated each approach and assigned weights to them. Like the Utilities' experts, the PUC gave no weight to the comparable sales approach, ruling that this approach is of marginal usefulness given the limited market for regulated utilities like PWW, and finding that the sales upon which the City's experts relied were not, in fact, comparable.

With respect to the reproduction cost less depreciation approach, the PUC found that the use of this approach by the Utilities' experts was more credible than its use by the City's experts. Thus, the PUC accepted the figures used by the Utilities' experts to value PWW's land and certain intangible property. Ultimately, under this approach, the PUC valued PWW's assets to be worth $210,349,285 as of December 31, 2008.

With respect to the capitalized earnings approach, which focuses upon estimates for earnings and capitalization rates, the PUC observed that the Utilities' experts used a not-for-profit cash flow as the measure of earnings in its discounted cash flow analysis. They began with PWW's projected financial statements and then made adjustments to them to account for certain not-for-profit cost advantages, such as income tax savings, access to low-cost municipal financing, property tax savings, and relief from regulatory expense. By contrast, the City's experts used PWW's own regulated income stream and regulated rate-of-return capitalization rate to compute value. Whereas the Utilities' experts assumed that a buyer would be a not-for-profit entity, the City's experts assumed that a buyer would be a privately-owned entity like PWW. The PUC found the testimony of the Utilities' experts persuasive on this point. The PUC concluded "that so long as it is legally permissible for not-for-profit buyers, that is more than one such buyer, to buy PWW, which is the case here, their influence on valuation as part of the population of willing buyers must be given full effect."

The experts also disagreed about capitalization rates, with the Utilities' experts recommending a 5% rate from which 2% is deducted for growth and the City's experts recommending a 7.2% rate from which 0% is deducted for growth. The PUC found that the Utilities' growth rate was inflated, and, thus used the Utilities' base rate and the City's 0% growth rate.

To calculate the value of PWW's assets under the capitalized earnings approach, the PUC divided earnings of $8,540,012 by a capitalization rate of 5%, which yielded an income valuation of $170,800,230. From this, it

deducted $826,099 to account for the present value of negative net cash flows for the years 2006 to 2009, and determined that the final value of PWW's assets was $169,974,131 as of December 31, 2005, and $192,053,771 as of December 31, 2008. The PUC then weighted the reproduction cost less depreciation approach at 60% and the capitalized earnings approach at 40% and, with that weighting, calculated the overall fair market value of PWW's assets to be $203,031,079 as of December 31, 2008.

Both the City and Merrimack Valley (the entity to which the City may eventually convey PWW) challenge the PUC's valuation of PWW's assets. Specifically, both the City and Merrimack Valley contest how the PUC applied the capitalized earnings approach, asserting that the PUC erred by assuming that there could be more than one not-for-profit entity within the pool of hypothetical buyers of PWW and that the presence of these entities required using a not-for-profit cash flow to estimate earnings and a 5% capitalization rate.

We first address the argument of the City and Merrimack Valley that the PUC's assumptions are unreasonable because there is *no* evidence from which the PUC could have made them. *See Legislative Utility Consumers' Council*, 118 N.H. at 99. This argument "is readily dismissed by the common principle that conflicts in the evidence are to be resolved by the [trier of fact], who could accept or reject such portions of the evidence presented as [it] found proper, including that of the expert witnesses," *Crown Paper Co. v. City of Berlin*, 142 N.H. 563, 570 (1997) (quotation and brackets omitted), and by the fact that the PUC's assumptions were based upon the testimony and reports of the Utilities' experts. *Southern N.H. Water Co. v. Town of Hudson*, 139 N.H. 139, 141 (1994).

██ The City and Merrimack Valley mistakenly contend that the testimony and reports of the Utilities' experts do not constitute evidence from which the PUC could have made its own assumptions because they were flawed. In making these arguments, the City and Merrimack Valley seek to impose upon PUC proceedings the evidentiary standards we have adopted for trial proceedings. *See* RSA 516:29-a (2007); N.H. R. Ev. 702. These evidentiary standards do not apply to PUC proceedings. *See Appeal of McKenney*, 120 N.H. at 80-81; RSA 541:17. Even if we were to agree that the testimony and reports of the Utilities' experts would have been inadmissible in a trial, their admission in the PUC proceeding does not render its decision unjust, unreasonable or unlawful. *Appeal of McKenney*, 120 N.H. at 81.

██ Further, the arguments of the City and Merrimack Valley ignore the possibility that in making its assumptions, the PUC did not rely exclusively upon the testimony and reports of the Utilities' experts, but also relied

upon its own experience and expertise. *See New England Tel. & Tel. Co.*, 113 N.H. at 101-02. When deciding cases such as this one, the PUC must bring to its decision-making an expertise and knowledge of the industries it regulates. *See Appeal of Public Serv. Co. of N.H.*, 122 N.H. 1062, 1075 (1982).

■ The City and Merrimack Valley essentially argue that the PUC erred by finding the Utilities' experts more credible with respect to the capitalized earnings approach than the City's experts. Once testimony is admitted, it is the PUC's duty to resolve issues of fact and conflicts of opinion. *Appeal of McKenney*, 120 N.H. at 81. The PUC is not compelled to accept the opinion evidence of any one witness or group of witnesses, including expert witnesses. *See id.* As the trier of fact, the PUC could accept or reject such portions of the evidence as it found proper, including that of expert witnesses. *See Tennessee Gas Pipeline Co.*, 145 N.H. at 602. The PUC was not required to believe even uncontroverted evidence. *See Brent v. Paquette*, 132 N.H. 415, 418 (1989).

■ Further, there was support in the record for the PUC's credibility determination. The PUC could have reasonably determined that the approach advocated by the City's experts was contrary to New Hampshire law. The City's experts assumed that the eventual purchaser of PWW would be a for-profit entity. We have previously held, however, that it is error not to consider a potential unregulated municipal buyer when valuing a water utility. *See Southern N.H. Water Co.*, 139 N.H. at 142. Failing to consider an unregulated purchaser in the capitalized earning approach "overestimates the effect of PUC regulation on fair market value." *Id.* at 143. Even if such a purchase is unlikely, we have held that it must be considered. *Id.* at 142. "The unlikelihood of sale is, after all, the reason why valuation of public utilities is so extraordinarily difficult and why this court has typically given the trier of fact considerable deference in this area." *Id.* Moreover, by using PWW's cash flow, the City's experts valued PWW essentially at its rate base or net book value. We have recognized, however, that "it is possible that a prospective purchaser would pay more than net book cost." *Tennessee Gas Pipeline Co.*, 145 N.H. at 602; *see Public Service Co.*, 101 N.H. at 151.

■ Additionally, there was evidence in the record from which the PUC could have found (although it did not do so) that the City's experts were biased. As the PUC noted, there was evidence that the City's experts were specifically hired "to advocate that acquiring PWW's assets was in the public interest." There was evidence as well that the City's experts stood to benefit financially if the City's condemnation of PWW succeeded. Further,

there was evidence that the City's experts promised the City, before they were engaged, that they would produce a valuation within a specific range, which would allow the City to finance the purchase without raising rates, and that the valuation they produced was close to this range. We conclude, therefore, that the PUC was not compelled on the record before it to find the City's experts more credible than the Utilities' experts with regard to their use of the capitalized earnings approach to valuation. *See Brent*, 132 N.H. at 418.

██ Having concluded that there is evidence to support the PUC's assumptions, we next address the arguments of the City and Merrimack Valley that these assumptions were legally invalid. The City and Merrimack Valley contend that the assumption that there could be more than one not-for-profit entity within the pool of potential buyers of PWW violates RSA chapter 38. We disagree that RSA chapter 38 precludes more than one municipality, town or regional water district from competing to purchase a public utility. Nothing in RSA chapter 38 requires that only one municipality, town or regional water district bid upon such a purchase at a time.

██ The City and Merrimack Valley next argue that by adopting the assumptions of the Utilities' experts, the value the PUC gave to PWW's assets under the capitalized earnings approach was not fair market value, but was, instead, the investment value of PWW to the City. In this argument, the City and Merrimack Valley again fault the PUC for assuming that the likely purchaser of PWW would be a not-for-profit entity, thus requiring the use of an enhanced cash flow and a 5% capitalization rate. As previously discussed, this assumption has support in the record and is not legally erroneous. Because we conclude that this assumption was supported by the evidence and is not legally erroneous, we disagree that the eventual value that the PUC gave to PWW's assets was not fair market value. Having found that the PUC's valuation has support in the record and that it is not erroneous as a matter of law, we uphold it.

*E. Mitigation Fund*

Finally, we address whether the PUC erred by requiring a mitigation fund of $40 million to compensate the customers of PWW's affiliates. Acting pursuant to RSA 38:9, III, which obliges the PUC to "determine the amount of damages, if any, caused by the severance of the plant and property proposed to be purchased from the other plant and property of the owner," the PUC required the City to create a fund to mitigate the harm to Pennichuck East and Pittsfield Aqueduct customers from losing the synergies associated with PWW's assets. The PUC accepted the testimony of the Utilities' expert that Pennichuck East and Pittsfield

Aqueduct, combined, would need $3.4 million in additional annual revenue if the City takes PWW. The PUC also accepted the Utilities' expert's testimony that an initial fund investment of $40 million would be required to generate annual earnings of $3.4 million. The expert testified that a fund of this size would insulate the customers of Pennichuck East and Pittsfield Aqueduct from the rate increases related to the City's taking of PWW.

 The Utilities contend that a $40 million fund will not generate $3.4 million annually. For its part, the City asserts that requiring it to establish a fund of this magnitude is unreasonable. Because the parties have failed to show that there is *no* evidence from which the PUC could have found as it did, *see Legislative Utility Consumers' Council*, 118 N.H. at 99, and in light of the deference we owe the PUC in such proceedings, *see Appeal of Verizon New England*, 158 N.H. at 695, we decline to overturn its findings with respect to the $40 million mitigation fund.

*Affirmed.*

BRODERICK, C.J., and DUGGAN and HICKS, JJ., concurred.