NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Board of Tax and Land Appeals
No. 2015-0625


APPEAL OF NEW HAMPSHIRE ELECTRIC COOPERATIVE, INC.
(New Hampshire Board of Tax and Land Appeals)

Argued: January 12, 2017
Opinion Issued: June 2, 2017


Sulloway & Hollis, P.L.L.C., of Concord (Margaret H. Nelson and Derek D. Lick on the brief, and Ms. Nelson orally), for the petitioner, New Hampshire Electric Cooperative, Inc.


Mitchell Municipal Group, P.A., of Laconia (Judith E. Whitelaw and Walter L. Mitchell on the joint brief, and Mr. Mitchell orally), for respondents Town of Andover, Town of Brentwood, Town of Grafton, Town of Lempster, Town of Lyme, Town of New Hampton, Town of Northfield, Town of Plainfield, Town of Thornton, and Town of Warren.


Gardner, Fulton, & Waugh, PLLC, of Lebanon (Shawn M. Tanguay on the joint brief), for respondent Town of Colebrook.

Donahue, Tucker & Ciandella, PLLC, of Meredith (Christopher L. Boldt and Eric A. Maher on the joint brief), for respondents Town of Epping and Town of Unity.

George E. Sansoucy, self-represented, by joint brief.

Joseph A. Foster, attorney general (Laura E. B. Lombardi, senior assistant attorney general, on the brief), for the New Hampshire Department of Revenue Administration, as amicus curiae.

Pierce Atwood, LLP, of Portland, Maine (Jonathan A. Block on the brief), for Unitil Energy Systems, Inc., Northern Utilities, Inc., and Granite State Gas Transmission, Inc., as amici curiae.

Judy A. Silva, Cordell A. Johnston, Stephen C. Buckley, and Margaret M.L. Byrnes, of Concord, for New Hampshire Municipal Association, by brief, as amicus curiae.

LYNN, J.  New Hampshire Electric Cooperative, Inc. (NHEC) appeals an order of the New Hampshire Board of Tax and Land Appeals (BTLA) denying 16 of NHEC's 23 individual tax abatement appeals regarding its property located in 11 of the respondent municipalities for tax year 2011 and 12 of the respondent municipalities for tax year 2012.  We affirm.

I

The relevant facts follow.  NHEC is an electric cooperative, which means that it is member-owned by its customers.  NHEC provides electricity distribution services to approximately 80,000 members in 115 municipalities, but it does not engage in the generation of electricity and provides only incidental transmission services.  NHEC operates under a "regulatory compact" that grants NHEC a franchise to operate a monopolistic electric distribution company.  In return, NHEC is required to provide electric service to all who request it within its territory and to keep its utility property in good working order.  Unlike a privately-owned utility, NHEC's rates are not set by the New Hampshire Public Utilities Commission (PUC).  Instead, NHEC's member-

2

elected board of directors establishes NHEC's electricity rates based upon "cost of service" principles.

NHEC's property consists primarily of wooden utility poles, attachments and conduits over public and private rights-of-way, substations, land, buildings, and other equipment located in some, but not all, of the municipalities. The parties' experts agreed that NHEC is professionally managed and that its property is in good condition and is well maintained.

A municipality's selectmen are required to appraise the value of the property located within the municipality, including utility property. See RSA 75:1 (Supp. 2016); RSA 72:8 (2012); see also RSA 72:9 (2012) (stating that utility property that is situated in more than one town "shall be taxed in each town according to the value of that part lying within its limits"). Separately, the New Hampshire Department of Revenue Administration (DRA) appraises NHEC's property at the state level for purposes of the RSA chapter 83-F utility tax. See RSA ch. 83-F (2012 & Supp. 2016). For the 2011 and 2012 tax years, the municipal assessments of NHEC's property that are the subject of these tax abatement appeals were substantially higher than the DRA's assessments of the same property.

NHEC filed tax abatement appeals to the BTLA for 23 municipal assessments of its property that occurred in 2011 and 2012. The BTLA held a consolidated hearing over nine days between January and February 2015 regarding NHEC's tax abatement appeals. During the hearing, NHEC presented expert witness testimony and an appraisal of NHEC's property from George K. Lagassa, a certified general real estate appraiser and the owner of Mainstream Appraisal Associates, LLC. In his appraisals, Lagassa estimated the market value of NHEC's property by reconciling the results of four valuation approaches: a sales comparison approach; an income approach, which estimated the value of NHEC's property by capitalizing the company's net operating income; a cost approach, which estimated the net book value (NBV) of NHEC's property by calculating the original cost less book depreciation (OCLBD) of NHEC's property; and a second cost approach, which estimated the value of NHEC's property by calculating the reproduction cost new less depreciation (RCNLD) of NHEC's property.

NHEC also presented testimony from Scott E. Dickman, a New Hampshire certified general appraiser employed by the DRA in its Property Appraisal Division as a utility appraiser. Additionally, NHEC submitted the DRA appraisals that Dickman had prepared for the purpose of the RSA chapter 83-F statewide utility property tax. Dickman used the "unit method" to appraise NHEC's property. Under the unit method, an appraiser first values all of a utility's property as a whole and then allocates that whole unit value to the individual municipalities where the utility's property is located. To derive his unit value, Dickman primarily used two valuation approaches: a cost

3

approach, which estimated the value of NHEC's property based upon the OCLBD of NHEC's property; and an income approach, which estimated the value of NHEC's property by capitalizing the company's net operating income.

The municipalities presented expert testimony and appraisals from three certified New Hampshire assessors: Gary J. Roberge, CEO of Avitar Associates of New England, Inc.; Frederick H. Smith, of Brett S. Purvis & Associates; and George E. Sansoucy, who is also a licensed New Hampshire engineer. Roberge used an RCNLD approach to value NHEC's property in the municipalities for which he was engaged. Smith also used an RCNLD approach to value NHEC's property in the municipalities for which he was engaged. To estimate the value of NHEC's property in the municipalities for which he was engaged, Sansoucy reconciled the results of four approaches: a sales comparison approach; an RCNLD cost approach; an income approach that assumed a sale to a privately-owned, regulated utility; and a second income approach that assumed a sale to a publicly-owned utility.

In July 2015, the BTLA issued a thirty-two page order granting seven of NHEC's abatement appeals and denying the remainder. For the appeals that it granted, the BTLA found that the municipal assessors acknowledged or reached value conclusions reflective of a material degree of overassessment of the properties at issue. Regarding NHEC's other appeals, the BTLA found that the Lagassa appraisals and DRA appraisals did not result in a credible opinion of market value and ruled that NHEC had not met its burden of proving that the local assessments were disproportional. Additionally, the BTLA reviewed the criticisms leveled at the assessment methodologies used by the municipal assessors, as well as the municipalities' responses to those criticisms, but it ruled that it need not address those points because challenges based upon assessment methodology do not, and cannot, carry NHEC's burden of proving disproportionality.

NHEC filed a motion for rehearing. The BTLA issued a written order denying NHEC's motion in September 2015. This appeal followed.

II

Our standard for reviewing BTLA decisions is set forth by statute. See RSA 541:13 (2007); RSA 71-B:12 (2012) (providing that BTLA decisions may be appealed in accordance with RSA chapter 541 (2007)). The BTLA's findings of fact are deemed prima facie lawful and reasonable. See RSA 541:13; Appeal of Town of Charlestown, 166 N.H. 498, 499 (2014). "To prevail, the [appellant] must show by a preponderance of the evidence that the BTLA's decision was clearly unreasonable or unlawful." Town of Charlestown, 166 N.H. at 499; see also RSA 541:13. "We will not set aside or vacate a BTLA decision except for errors of law, unless we are satisfied, by a clear preponderance of the evidence

4

before us, that such order is unjust or unreasonable." Town of Charlestown, 166 N.H. at 499-500 (quotation and brackets omitted); see also RSA 541:13.

III

On appeal, NHEC argues that the BTLA erred by: (1) rejecting the DRA appraisals and Lagassa's appraisals; (2) ruling that NHEC had presented only methodological challenges to the municipalities' assessments; and (3) violating constitutional and statutory requirements that taxation be uniform and proportional by rejecting NHEC's estoppel argument and allowing local municipal assessments to be significantly greater than the DRA assessments that are used to determine a municipality's share of county taxes.

A

NHEC first argues that the BTLA's decision to reject the NHEC and DRA appraisals was legally erroneous, unjust, and unreasonable. Specifically, NHEC argues that the BTLA erred by: (1) failing to properly account for the impact of regulation upon the market value of NHEC's property; (2) rejecting the DRA appraisals; and (3) rejecting the Lagassa appraisals. We address each argument in turn.

"New Hampshire tax abatement statutes provide the exclusive remedy to a taxpayer dissatisfied with an assessment." Porter v. Town of Sanbornton, 150 N.H. 363, 367 (2003). To succeed on a tax abatement claim, a taxpayer has the burden of proving by a preponderance of the evidence that it is paying more than its proportional share of taxes. Id. "To carry the burden of proving disproportionality, the taxpayer must establish that the taxpayer's property is assessed at a higher percentage of fair market value than the percentage at which property is generally assessed in the town." Id. at 368.

"Determination of fair market value is an issue of fact." Appeal of Pennichuck Water Works, 160 N.H. 18, 37 (2010) (ellipsis omitted). However, "[w]e have previously recognized the extraordinary difficulties in placing a fair market value on the property of a regulated utility." Id. (quotation omitted). "Because of this difficulty, we give the trier of fact considerable deference in this area." Id. (quotation omitted). "The trier of fact may use any one or a combination of five appraisal techniques in valuing public utility property: original cost less depreciation (rate base or net book), comparable sales, cost of alternative facilities, capitalized earnings, and reproduction cost less depreciation." Id. at 38. "Typically all relevant factors must be considered, but a trier of fact need not allocate specific weight to any one of the approaches listed." Id. (quotation omitted). "All of the enumerated approaches are valid, but all also have weaknesses." Id. "We have never attempted to tie the fact finder's hands with a rigid fair market value formula in the absence of

5

legislative directive." Id. (quotation, brackets, and ellipsis omitted). "Rather, judgment is the touchstone." Id. (quotation omitted).

In reviewing the board's findings, "our task is not to determine whether we would have found differently than did the board, or to reweigh the evidence, but rather to determine whether the findings are supported by competent evidence in the record." Appeal of Sutton, 141 N.H. 348, 350 (1996) (quotation and brackets omitted). "When faced with conflicting [expert] testimony, a trier of fact is free to accept or reject an expert's testimony, in whole or in part." LLK Trust v. Town of Wolfeboro, 159 N.H. 734, 740 (2010); see also Appeal of Pennichuck Water Works, 160 N.H. at 41. We will uphold the trier of fact's factual findings unless the evidence does not support them or they are erroneous as a matter of law. See Town of Atkinson v. Malborn Realty Trust, 164 N.H. 62, 66 (2012).

i

NHEC argues that the BTLA's decision failed to properly account for the impact of regulation upon the market value of NHEC's property. NHEC specifically argues that the PUC would limit any utility purchaser to a return based upon NBV, and, therefore, the BTLA was obligated by Appeal of Public Service Co. of New Hampshire, 124 N.H. 479 (1984), to find that NHEC's fair market value was equal to its NBV. In Appeal of Public Service Co. of New Hampshire, we stated that "a utility which, after presenting evidence on all of the relevant methods of valuation, can establish the presence of regulation so restrictive as to limit any prospective purchaser of its property to a return based on the [NBV] of the property, should be deemed to have proven that the property's market value is equal to its [NBV], in the absence of any specific evidence of higher market value." Appeal of Public Serv. Co. of N.H., 124 N.H. at 486.

The BTLA found that NHEC had made only "very general assertions regarding regulation and its alleged impact on the market value of [NHEC's] property." It therefore concluded that NHEC had failed to provide sufficient probative evidence that the utility regulatory environment in which NHEC operates, considering both the benefits and burdens of such regulation, was so restrictive as to prove the local assessments were disproportional. Based upon our review of the record, we agree with the BTLA.

NHEC's argument primarily relies upon the impact that regulation would have upon the sale of a utility. It argues that PUC approval is required for any sale of the utility and that the PUC disfavors passing on acquisition costs to customers. However, simply because the PUC disfavors passing acquisition costs to customers does not mean that the practice is forbidden. Indeed, both Sansoucy and Lagassa cited sales in which the PUC has approved sales above net book and allowed certain acquisition costs to be charged to the utility's

6

ratepayers.[1]  Additionally, Sansoucy testified that, although a buyer may not be allowed to add the premium to its rate base (the amount upon which a utility can earn a rate of return), it may instead be allowed to amortize that premium. If allowed to amortize the premium, the buyer can effectively recoup that premium from ratepayers — it just cannot earn an additional return on that premium.

Although NHEC focused upon the burdens of utility regulation, the BTLA heard extensive testimony from Sansoucy and Roberge regarding the benefits of regulation.  When the BTLA asked Dickman for his opinion of the level of regulation, Dickman conceded that New Hampshire utilities were "[l]ess regulated than more regulated, but constrained by . . . [a] competitive market." Moreover, because NHEC is a publicly-owned utility, it is not subject to full rate-making regulation.  NHEC's member-elected board of directors can set its own rates and does not need PUC approval.  In light of this evidence, we find no error in the BTLA's determination that NHEC had not presented sufficient evidence of restrictive regulation to carry its burden of demonstrating that the municipal assessments were disproportional.

Furthermore, even if we accept NHEC's argument that it has proven that regulation is so restrictive as to limit any prospective purchaser of its property to a return based upon the NBV of the property, this proves only that the property's market value is equal to its NBV "in the absence of any specific evidence of higher market value."  Id.  Here, the BTLA heard expert testimony from Sansoucy, Roberge, and Smith that NHEC's market value exceeded its NBV.[2]  NHEC's expert, Lagassa, analyzed 11 sales and concluded that the market value of the sold utilities was, on average, nineteen percent higher than NBV.  Sansoucy analyzed nine sales that demonstrated that the market value of utilities exceeded NBV by an even greater amount.  Taken together, the BTLA had sufficient specific evidence that, notwithstanding the impact of regulation, the market value of NHEC was not limited to its NBV.  Thus, the BTLA was not required by our holding in Appeal of Public Service Co. of New Hampshire to find that the market value of NHEC equaled its NBV.

---

[1] NHEC and the municipalities disagree about the sale price in one of the sales that was used by both Lagassa and Sansoucy: PSNH's 2007 purchase of Connecticut Valley Electric Co.  See In re Connecticut Valley Electric Co., N.H. PUC No. 24,176 (May 23, 2003).  The PUC approved the sale, which included an approximately $9 million payment to CVEC, equal to the NBV of its assets, and a $21 million payment to CVEC's parent company to terminate a power supply contract between the two utilities.  NHEC argues that this sale demonstrates that PSNH acquired CVEC at its NBV. The municipalities argue that this sale demonstrates that PSNH paid $30 million to acquire CVEC.  This same disagreement arose in the companion case, Appeal of Public Service Co. of New Hampshire, ___ N.H. ___, ___ (decided June 2, 2017) (slip. op. at 7-8).  For the reasons that we stated in that case, we agree with the municipalities.  See Appeal of Public Serv. Co. of N.H., ___ N.H. at ___ (decided June 2, 2017) (slip. op. at 7-8).

[2] When considered in light of this evidence it becomes apparent that what NHEC is really arguing is that the BTLA was required to accept its version of disputed facts.  That, of course, is contrary to well-settled law, as explained earlier in the text.

NHEC argues that the BTLA's rejection of DRA appraisals that used the unit method of valuation is contrary to New Hampshire law. We disagree.

We have never held that a single valuation approach or specific combination of approaches is correct as a matter of law. See Appeal of Pennichuck Water Works, 160 N.H. at 38. To the contrary, the credibility of an appraisal is a question of fact that the BTLA must decide based upon the evidence presented in a given case. Id. at 37. This is why the trier of fact is given considerable deference regarding determinations of fair market value and "need not allocate specific weight to any one of the approaches listed." Id. at 38. In this case, the BTLA did not find that the unit method can never be used. Rather, it found that the specific DRA appraisals in question were not persuasive. As the trier of fact, the BTLA could properly reject any appraisal that it found did not result in a credible opinion of market value. See id.

NHEC next argues that the BTLA erred by finding that the DRA's appraisals did not result in a credible opinion of NHEC's value. Essentially, NHEC argues that, because the DRA's appraisals used widely accepted methodology and procedures to value NHEC's property, the BTLA should not have rejected the appraisals.

Just because the BTLA accepted a particular valuation approach in one case does not mean that it must accept a subsequent appraisal that uses a similar approach. Each appraisal necessarily requires the appraiser to make a large number of discretionary decisions. Here, for example, Dickman made a discretionary decision to use only one cost approach to value, while Lagassa decided to use multiple cost approaches to value. Regarding Dickman's one cost approach to value, he made a discretionary decision to select the OCLBD approach over the RCNLD approach or replacement cost approach, while Lagassa decided to use both the OCLBD and RCNLD approaches. Dickman made a discretionary decision not to conduct a sales comparison approach to value, while Lagassa decided to conduct a sales comparison approach. In Dickman's cost approach, he made a discretionary decision in how he calculated depreciation, selecting external obsolescence factors different from those used by Lagassa in his cost approach. Dickman made decisions regarding how much weight to afford his cost and income approaches, and these weights: (a) shifted from year to year; and (b) differed from the weights that Lagassa applied in his value reconciliations. Indeed, when the BTLA asked Dickman why he allocated on the basis of the original cost of the components in each municipality, Dickman acknowledged that "to the extent that allocation theory has been discussed, it is well understood that there's no perfect mechanism to effect this."

The fact that each utility appraisal involves numerous discretionary decisions is precisely why the BTLA, as the fact finder, is in the best position to weigh the testimony and determine whether an appraisal presents an accurate opinion of market value. In this case, the BTLA examined Dickman's appraisals, heard his testimony, and heard testimony from the municipalities' experts that criticized Dickman's procedures, assumptions, calculations, and conclusions. As the fact finder, it was proper for the BTLA to weigh this conflicting expert testimony. See LLK Trust, 159 N.H. at 740. After weighing all of the evidence, the BTLA rejected Dickman's appraisals. Because there is support in the record for the BTLA's credibility determination, we cannot find as a matter of law that the BTLA erred by rejecting Dickman's appraisal. See Appeal of Sutton, 141 N.H. at 350.

NHEC also argues that the BTLA erred by concluding that the method that the DRA used to allocate its unit value of NHEC to the individual towns was flawed. Specifically, it points out that we found the DRA's allocation procedures to be proper in Appeals of Town of Bow & a., 133 N.H. 194 (1990). We find this argument unconvincing.

In that case, the burden of proof was on the municipalities, as the appealing parties, to establish that the DRA's allocation method was unfair. Town of Bow, 133 N.H. at 199; see also RSA 541:13 (prescribing the applicable standard of review for appeals of BTLA decisions). In rejecting one municipality's argument that the DRA's allocation method was unfair, we found that "[t]he record does not reveal that [the municipality] has demonstrated mathematically exactly how the DRA's method of allocation of PSNH property over-values that total property within the [municipality], or the extent of the harm to [the municipality] from such allocation." Town of Bow, 133 N.H. at 203. We made no determination that the DRA's allocation method was credible. In fact, we specifically noted that the DRA's allocation method could be unfair: "While it is conceivable that the DRA's method could unfairly disadvantage [the municipality], we have insufficient evidence before us upon which we can determine that the allocation has harmed [the municipality]." Id. Thus, Town of Bow does not stand for the proposition that allocating a unit value on the basis of original cost always results in a credible opinion of market value. Rather, the determination of whether an allocation results in a credible opinion of market value is a factual issue for the trier of fact to decide.

Here, Dickman submitted a unit appraisal that allocated on the basis of original cost. NHEC argues that Dickman explained that this "allocation procedure properly reflects the contribution of each component of utility property to the value of the entire system and can flexibly take into account both new investment and retirements to that system." However, the BTLA was not required to accept Dickman's testimony. See Appeal of Pennichuck Water Works, 160 N.H. at 41. Additionally, the municipalities presented evidence challenging the accuracy of Dickman's allocation. In particular, Sansoucy

testified that such an allocation would not result in a credible opinion of NHEC's market value in a given town because NHEC keeps original cost data only on a system-wide basis and does not have original cost information for any specific town. NHEC's financial services manager, Brenda Inman, confirmed that NHEC does not keep original cost information for distribution equipment on a town-by-town basis and instead keeps track of original cost using cost averages. Under this system, for example, NHEC can identify the average original cost of all of its utility poles, but it cannot identify the original cost of any specific utility pole. When NHEC provides the DRA with original cost information for a specific town, those original cost values are derived by multiplying NHEC's system-wide cost average for distribution equipment on a per mile basis by the total miles of pole-line wire that is located within a municipality.

Sansoucy testified that allocating simply on the basis of original cost can lead to inequities in how municipalities are allocated their portion of the DRA's unit value. Specifically, the positive impact of valuable property in one municipality is shifted, in part, to municipalities that do not contain that valuable property. Similarly, the negative impact of distressed property is shifted, in part, to municipalities that do not contain that distressed property. Sansoucy testified that this allocation method results in appraisals that fail to appraise only the specific property located within each municipality. See also RSA 72:9 (requiring utility property to be "taxed in each town according to the value of that part lying within its limits"). Therefore, because the BTLA had evidence before it regarding the flaws of Dickman's allocation method and the impact of those flaws, we find no error in the BTLA's finding that the allocation methods employed by Dickman in the DRA appraisals resulted in market values that were not valid.

In sum, the BTLA was not required to find the DRA appraisals or allocated values credible as a matter of law, and it had sufficient evidence from which it could properly reject the DRA appraisals and allocated values. Therefore, because the BTLA's credibility determination is not erroneous as a matter of law, unjust, or unreasonable, we uphold it. See Town of Charlestown, 166 N.H. at 499-500.

iii

NHEC next argues that the BTLA erroneously rejected Lagassa's appraisals, which, it claims, used well-accepted techniques to value NHEC's property. We disagree. In its order, the BTLA made numerous findings that supported its determination that Lagassa's appraisals were flawed, and these findings are supported by the record.

The BTLA found Lagassa's income approach to be flawed, in part, because of how Lagassa incorporated the three years of expense information

that NHEC provided him. The BTLA noted that Lagassa did not conduct any independent analysis to determine whether any of the expenses were non-recurring or why any category of expenses changed dramatically from one year to the next. Instead, Lagassa limited his analysis to a simple arithmetic average of the previous three years of expenses. The BTLA also criticized Lagassa for deducting the non-cash items of actual book depreciation and amortization from his income approach. The BTLA found that such non-cash items are not typically included in an income approach to market valuation. Lagassa also relied upon book depreciation rather than actual depreciation. The BTLA noted that book depreciation, unlike actual depreciation, is based upon historical cost or another previously established figure that may have no relation to current market value. The BTLA found that, to the extent that book depreciation is higher than actual physical depreciation, use of book depreciation would result in Lagassa calculating a lower net operating income.

Lagassa also performed an independent income analysis for each community, despite the fact that NHEC lacked expense records on a town-by-town basis. Consequently, Lagassa calculated one municipality, Northfield, as having a net operating income of negative $100,514, a result that he described as "an accident of the formula used to allocate expenses to Northfield."

The BTLA also found Lagassa's cost approaches to be flawed. Lagassa's NBV determination was a calculation of OCLBD. The BTLA noted that NBV is relevant to "rate-making" for a regulated utility, but the objective of the rate-making authority is not necessarily to arrive at market value conclusions but rather to set rates that balance the interests of the public and the regulated entity. Additionally, NHEC acknowledged that it has not been subject to full rate base regulation by the PUC since the early 2000s.

The BTLA disagreed with Lagassa's opinion that a buyer would not pay more for utility property than rate base. It found this argument to be contradicted by seven of the eleven sales that Lagassa cited as well as by a report prepared jointly by the PUC and the Liberty Consulting Group (Liberty Report). The Liberty Report demonstrated that utility assets can have market values dramatically higher or lower than NBV.[3] Lagassa testified that regulatory constraints would preclude a potential buyer from paying more than rate base. However, the BTLA heard contradictory testimony from the

---

[3] NHEC argues that the BTLA erred by relying upon the Liberty Report because it "has no relevance whatsoever to the market value of NHEC distribution assets." We disagree. The BTLA made it clear in its order that it relied upon the Liberty Report only to the extent that it contradicted Lagassa's claim that no buyer of a utility would pay more than rate base. The Liberty Report concluded otherwise and thus is relevant contradictory evidence that the BTLA could properly weigh. Moreover, the sales cited by Lagassa and Sansoucy provided sufficient independent evidence from which the BTLA could properly conclude that a buyer of NHEC would pay more than rate base for the cooperative.

municipalities' experts and thus was free to reject Lagassa's testimony regarding the impact of regulatory constraints.

The BTLA also criticized Lagassa's RCNLD cost approach. In this approach, Lagassa relied upon a 2003 survey prepared by landscape architects for the purpose of examining the pros and cons of using overhead versus underground utilities in Vermont. Sansoucy testified that this study was not credible because it was outdated, performed by architects rather than appraisers, and inferior to multiple cost manuals that Lagassa could have accessed. Lagassa's computation of depreciation included physical depreciation of over 50% of original cost and a further 27% deduction for economic obsolescence, sometimes leading to a value below NBV. The BTLA criticized Lagassa's decision to take such large deductions and noted our decision in Southern New Hampshire Water Co. v. Town of Hudson, 139 N.H. 139 (1994), in which we reasoned that if we "had meant economic depreciation to be nothing more than a way to equate reproduction cost with rate base, we would have had no reason to approve reproduction cost as a valid, independent approach to value." Southern N.H. Water Co., 139 N.H. at 143.

The BTLA also found inconsistencies in how Lagassa reconciled his multiple valuation approaches, both from municipality to municipality and between tax years for individual municipalities. The BTLA noted, for example, that for some towns he reconciled to NBV, for others he averaged NBV and his income approach, and in Grafton, he changed the multiple used in his sales comparison approach from 1.17 in 2011 to 1.0 in 2012. In fact, our review of the record shows that Lagassa changed the multiple used in his sales comparison approach from 1.17 in 2011 to 1.0 in 2012 for three other towns. The BTLA found Lagassa's explanations for these inconsistencies to be inadequate.

In sum, the BTLA determined that the Lagassa appraisals did not result in a credible opinion of market value, and it made findings to support its determination. Because these findings are supported by the record, we uphold them.

B

NHEC next argues that the BTLA erred by claiming that NHEC presented only methodological challenges to the municipalities' experts and did not present evidence that the municipalities' assessments exceeded market value.

The BTLA cited our decision in Porter for the proposition that evidence that an assessor used flawed methods does not carry a taxpayer's burden of proving disproportionality. See Porter, 150 N.H. at 369 ("While it is possible that a flawed methodology may lead to a disproportionate tax burden, the flawed methodology does not, in and of itself, prove the disproportionate

12

result."). NHEC, on appeal, does not challenge either the validity of Porter or the BTLA's reliance on Porter. Instead, NHEC argues that: (1) the BTLA did not make specific factual findings to support its reliance on Porter; and (2) NHEC presented evidence — that was not purely methodological — which demonstrated that the municipalities' assessments were disproportional.

With respect to NHEC's first argument, the BTLA correctly noted that the taxpayer, NHEC, bears the burden of showing that the municipalities' assessments were disproportional. The BTLA, in its role as fact finder, determined that NHEC had not presented sufficient credible evidence to carry its burden of proving disproportionality. Furthermore, the BTLA made thorough and specific findings explaining why it rejected the testimony and appraisals of Lagassa and Dickman. As discussed above, the BTLA's factual findings are supported by the record. The BTLA ultimately concluded that, because NHEC had not presented sufficient credible evidence to meet its burden, NHEC's remaining criticisms of the municipal assessors' methods could not, standing alone, carry its burden of proving disproportionality. The BTLA, therefore, found it unnecessary to address such criticisms.

As to the second point, NHEC argues that, beyond simply criticizing the municipal assessors' methods of appraising NHEC's property, it did present evidence that the municipal assessments were disproportionate. The evidence that NHEC points to includes: (1) variances between Sansoucy's valuations and the valuations of Lagassa and Dickman; (2) perceived flaws in Sansoucy's cost approach; (3) perceived flaws in his income approach; and (4) perceived flaws in his sales comparison approach. NHEC raised similar criticisms regarding the appraisals of Roberge and Smith. NHEC then concluded: "In short, the appraisals proffered by the various towns not only were methodologically flawed but overstated value and demonstrated a lack of the necessary expertise to properly value this type of property." (Emphasis added.)

As NHEC apparently recognizes, the evidence upon which it relies is primarily methodological. NHEC criticized the valuation approaches that the municipal assessors utilized as well as the estimates, assumptions, and calculations that those assessors made. This evidence of flawed methodology cannot, standing alone, carry NHEC's burden of proof. See Porter, 150 N.H. at 369. To the extent that Dickman and Lagassa testified regarding the impact that these flaws had on the municipal assessors' resulting market values, the BTLA was not required to accept that testimony. See LLK Trust, 159 N.H. at 740. NHEC claims that the municipal assessors overstated the value of NHEC's property, but because NHEC failed to provide a credible opinion of market value, it also failed to prove that the municipal assessments harmed NHEC. See Porter, 150 N.H. at 369 (stating that the trial court should have focused upon the actual harm, not the methodology that the town used to arrive at its assessment value).

13

Because the BTLA made specific factual findings that supported its conclusion that NHEC had not presented sufficient credible evidence to meet its burden of proving disproportionality, we find no error in the BTLA's statement that NHEC's remaining criticisms of the municipal assessors' appraisal methods could not, standing alone, carry NHEC's burden.

C

NHEC next argues that the BTLA violated constitutional and statutory requirements that taxation be uniform and proportional by rejecting NHEC's estoppel argument. NHEC contends that the doctrine of judicial estoppel should operate to bar municipalities from assessing NHEC's property at a value greater than the DRA's assessed value because the municipalities did not challenge the DRA's assessment. NHEC argues that, without estoppel, a municipality can accept the DRA's lower assessed values for purposes of calculating that municipality's share of county taxes but then use higher local assessment values to determine NHEC's share of the municipality's taxes.

As a preliminary matter, we note that although NHEC advanced the argument that the BTLA's decision violated Section 1 of the Fourteenth Amendment to the Federal Constitution in the "Questions Presented" section of its brief, NHEC made no further reference to the Federal Constitution in its brief. Accordingly, we conclude that NHEC has waived its federal claims, and we analyze its arguments under the State Constitution only. See State v. Burr, 142 N.H. 89, 92 (1997) ("[T]he defendant's failure to devote anything more than passing reference in his brief to retrospective laws and vested rights under the Federal Constitution renders those federal claims waived.").

New Hampshire has adopted the doctrine of judicial estoppel as part of its common law. See Kelleher v. Marvin Lumber & Cedar Co., 152 N.H. 813, 848 (2005). "Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, it may not thereafter, simply because its interests have changed, assume a contrary position." Id. (quotation, brackets, and ellipsis omitted). The purpose of the doctrine of judicial estoppel is "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." Id. (quotation omitted). "While the circumstances under which judicial estoppel may be invoked vary with each situation, the court considers the following three factors: (1) whether the party's later position is clearly inconsistent with its earlier position; (2) whether the party has succeeded in persuading a court to accept that party's earlier position; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." Id.

14

We find the doctrine of judicial estoppel to be inapplicable to this case. First, the doctrine applies when a party takes a position in a legal proceeding and then, subsequently, takes a contrary position. See id. Here, however, the municipalities did not take a position in a legal proceeding because the DRA equalization process is not a legal proceeding. Second, NHEC has not demonstrated that the municipalities have taken inconsistent positions. The municipalities are not accepting the DRA's lower assessed values when it serves the municipalities' interests, as NHEC argues. To the contrary, the municipalities submit their local assessed values to the DRA. See RSA 21-J:34, I (2012). It is the DRA that unilaterally substitutes the allocated values from its RSA chapter 83-F utility appraisal for the local assessed values supplied by the municipalities.[4] Thus, the "position" the municipalities are asserting is that their local assessed values represent the correct market value of NHEC's property. This position is consistent with assessing taxes against NHEC based upon those local assessed values. For these reasons, the doctrine of judicial estoppel is inapplicable here.

To the extent NHEC argues that the BTLA violated state statutory and constitutional principles of uniform and proportional taxation by rejecting NHEC's estoppel argument, NHEC has not pointed to any authority that requires the application of the common law doctrine of judicial estoppel to protect statutory and constitutional principles under these circumstances. The purpose of the doctrine is "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." Kelleher, 152 N.H. at 848 (quotation omitted). That purpose is not implicated here. Therefore, we find neither error nor violation of statutory or constitutional taxation principles in the BTLA's refusal to apply the doctrine of judicial estoppel.[5]

---

[4] Each municipality is required to assess the property within its jurisdiction. The municipalities must report their local assessments to the DRA. See RSA 21-J:34, I. The DRA, using these town reports, is required to equalize annually the value of the property in the state. See RSA 21-J:3, XIII (Supp. 2016). However, the DRA is not required to use the local assessments for purposes of its equalization process. See Appeal of Coos County Comm'rs, 166 N.H. 379, 385 (2014) ("[N]othing in the plain language of RSA 21-J:3, XIII prohibits the DRA from using its utility tax appraisal when determining equalized value."). In fact, the DRA stated in its amicus brief that "[i]n determining a municipality's equalized valuation for purposes of the county tax, the [DRA] includes the value of utility property and uses the allocated value from its RSA 83-F appraisal for each municipality." Thus, it is the DRA, not the municipalities, that is electing to use the DRA's valuations for purpose of determining a municipality's share of county taxes.

[5] NHEC argues that, in addition to judicial estoppel, quasi estoppel should operate to bar the municipalities from assessing NHEC's property at a value greater than the DRA's assessed value for NHEC. Quasi estoppel is "[a]n equitable doctrine preventing one from repudiating an act or assertion if it would harm another who reasonably relied on the act or assertion." Black's Law Dictionary 669 (10th ed. 2014); see also Farnum v. Bryant, 34 N.H. 9, 22 (1856) (ruling that a party who previously renounced and waived his interest in an estate was estopped from asserting that he was entitled to a share of that estate because the change in position would injure the other party for relying upon that prior renunciation). However, NHEC has not argued that it reasonably relied, to its detriment, upon any act or assertion of the municipalities. Accordingly,

15

NHEC also argues that the BTLA violated state statutory, state constitutional, and federal constitutional requirements that taxation be uniform and proportional by allowing local municipal assessments to be significantly greater than the DRA assessments that are used to determine a municipality's share of county taxes. Because NHEC made only a passing reference to the Federal Constitution and did not brief its claim that the Federal Constitution was violated, its federal claim is deemed waived. See Burr, 142 N.H. at 92.

Part I, Article 12 of the New Hampshire Constitution establishes that "[e]very member of the community has a right to be protected by it, in the enjoyment of his life, liberty, and property; he is therefore bound to contribute his share in the expense of such protection." N.H. CONST. pt. I, art. 12. "This article requires that a given class of taxable property be taxed at a uniform rate and that taxes must be not merely proportional, but in due proportion, so that each individual's just share, and no more, shall fall upon him." Eby v. State, 166 N.H. 321, 328 (2014) (quotation omitted). Part II, Article 5 of the State Constitution grants the legislature the power to "impose and levy proportional and reasonable assessments, rates, and taxes, upon all the inhabitants of, and residents within, the said state; and upon all estates within the same." N.H. CONST. pt. II, art. 5. "Each taxpayer's property must be valued at the same percentage of its true value as all the taxable property in the taxing district . . . ." Sirrell v. State, 146 N.H. 364, 370 (2001).

However, "the demand of constitutional equality in taxation anticipates some practical inequalities." Id. (quotation and brackets omitted). "Absolute mathematical equality is not obtainable in all respects if taxation is to be administered in a practical way." Id. (quotation omitted).

As discussed above, a municipality's share of county taxes is calculated, in part, based upon the DRA's chapter RSA 83-F utility assessments. NHEC argues that if a municipality thereafter levies taxes upon a utility based upon a higher market value for that property, the utility is paying a higher proportion of the county tax than other non-utility residents of that municipality. We disagree.

Each municipality assessed the fair market value of all the property within its borders. These assessments were used to determine the proportion that each property owner in the municipality would pay of the municipality's share of county taxes. As discussed above, NHEC failed to demonstrate that its property was being assessed disproportionately compared to other taxpayers within each municipality.

---

the doctrine of quasi estoppel is inapplicable here.

16

NHEC correctly argues that if the DRA had used the local utility assessment figures, which were generally higher than the values that the DRA used, when determining each municipality's share of county taxes, these municipalities would have been apportioned a higher share of county taxes. Under that circumstance, however, because the local utility assessments would remain unchanged, the proportion of county taxes that each property owner in a municipality would owe to the municipality would also remain unchanged. Because NHEC pays the same proportion of local taxes, regardless of the value of county taxes owed by the municipality, NHEC is not being taxed disproportionately compared to the other municipal residents, and there is no constitutional or statutory violation. See Appeal of Public Serv. Co. of N.H., ___ N.H. at ___ (decided June 2, 2017) (slip. op. at 15-16); see also Appeal of City of Nashua, 138 N.H. 261, 266 (1994) ("Our constitution mandates that all taxpayers in a town be assessed at the same proportion of fair market value." (quotation and brackets omitted) (emphasis added)); Stevens v. City of Lebanon, 122 N.H. 29, 32 (1982) ("It is well settled that the test in an abatement case is whether the taxpayer is paying more than his proportional share of taxes." (emphasis added)). Furthermore, for the same reasons that we discussed in the companion case, Appeal of Public Service Co. of New Hampshire, NHEC is benefiting, rather than being harmed, by this situation. See Appeal of Public Serv. Co. of N.H., ___ N.H. at ___ (decided June 2, 2017) (slip. op. at 16).

To the extent that the discrepancy between the DRA's assessments and the municipalities' assessments of NHEC's property is caused by methodological conflicts in how the DRA and municipalities are appraising utility property, we note that the legislature has provided no guidance on the methodology that should be used to determine a utility property's full and true value. See RSA 75:1; Appeal of Pennichuck Water Works, 160 N.H. at 38. Furthermore, the decision to adopt a uniform methodology for valuing utility property belongs to the legislature, not this court. See Appeal of Public Serv. Co. of N.H., ___ N.H. at ___ (decided June 2, 2017) (slip. op. at 16).

Affirmed.

DALIANIS, C.J., and HICKS, CONBOY, and BASSETT, JJ., concurred.

17